UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| TYRELL AVERHART,<br><br>                     Plaintiff,<br><br>– against –<br><br>ANTHONY J. ANNUCCI, Acting Commissioner of the New York State Department of Corrections and Community Supervision; Bureau Chief MARK PARKER; Senior Parole Officer CLARENCE R. NEELY; and Parole Officer LINDSY OSOUNA,<br><br>                     Defendants. | 21 Civ. ____ (__)<br><br>**COMPLAINT**<br>**JURY TRIAL DEMANDED** |

**PRELIMINARY STATEMENT**

1. This civil rights case challenges a condition of post-release supervision that has prohibited Plaintiff Tyrell Averhart from seeing his 16-month-old daughter since she was born. Defendants, officials of New York State's Department of Corrections and Community Supervision ("DOCCS"), imposed the no-contact condition without any justification or process in violation of Mr. Averhart's due process rights.

2. Defendants have offered no evidence that this interference with Mr. Averhart's familial rights is warranted and have conceded that they do not believe Mr. Averhart poses any threat to his daughter. In violation of their own policies, defendants did not conduct an investigation or ground the condition on evidence that Mr. Averhart posed a danger to his daughter and did not consider any less restrictive alternatives. They provided no notice of the ban, no written decision explaining their reasons, and no opportunity to be heard on why the ban is not justified.

3. When Mr. Averhart's term of incarceration expired in September 2020, defendants rejected his request to be released to his family's home because his daughter lives there and his parole officers banned his contact with her.

4. Constrained by the limited housing available to people designated as sex offenders and with no other viable residence, Mr. Averhart has remained in prison months after his release date.

5. Because of defendants' no-contact condition, Mr. Averhart has never met his daughter, J.C.[1]  And unless defendants lift the ban, Mr. Averhart will not meet J.C. for another two years, when his term of post-release supervision has expired and when she will be more than 3 years old.  Despite his September 2020 release date, he likely will remain in prison for much of that two-year period because he has no other home to which DOCCS can approve his release.

6. Defendants' ban on contact deprives Mr. Averhart of the opportunity to care for and bond with J.C. in the critical early years of her life.  It also deprives him of a stable, loving home with his mother and sister, who are now caring for J.C.  This arbitrary ban has caused immeasurable harm to Mr. Averhart and his daughter, whose only connection to her father has been his near-daily phone calls from prison.

7. Mr. Averhart seeks injunctive relief prohibiting defendants from enforcing this ban, declaratory relief declaring the ban violates his substantive and procedural due process rights under the Fourteenth Amendment of the United States Constitution, and appropriate monetary relief.

## PARTIES

8. Plaintiff Tyrell Averhart is the biological father of J.C., his 16-month-old daughter.  Prior to his current incarceration for a violation of a condition of his post-release

---

[1] To protect her privacy, J.C. is referred to only by her initials in this action. *See* Fed. R. Civ. P. 5.2(a)(3).

supervision, he lived at his family's home in Jamaica, New York and later at a homeless shelter on Wards Island in New York, New York. Though his prison term has ended, he is currently incarcerated at a residential treatment facility in Fishkill Correctional Facility in Beacon, New York because defendants' ban on contact will not permit his release to his family home where his daughter resides.

9. Defendant Anthony J. Annucci is the Acting Commissioner of DOCCS. Mr. Annucci is responsible for DOCCS' administration and operation and DOCCS' policies, including those policies governing the imposition and enforcement of conditions of community supervision. As Acting Commissioner of DOCCS, Mr. Annucci has the authority to implement any relief ordered by the Court. Mr. Annucci is sued in his official capacity only.

10. Defendant Mark Parker is employed by DOCCS as the Bureau Chief of DOCCS's Queens II area parole office. He has been involved in Mr. Averhart's supervision and in enforcing the conditions of his post-release supervision from around December 2017 to present. Mr. Parker is sued in his individual and official capacity.

11. Defendant Clarence R. Neely is employed by DOCCS as a Senior Parole Officer in Queens. He has been involved in supervising Mr. Averhart and in enforcing the conditions of his post-release supervision from around December 2017 to present. Mr. Neely is sued in his individual and official capacity.

12. Defendant Lindsy Osouna is employed by DOCCS as a Parole Officer for DOCCS in Queens. She was assigned to supervise Mr. Averhart and to enforce the conditions of his post-release supervision from around December 2017 to present. Ms. Osouna is sued in her individual and official capacity.

# FACTS

**Mr. Averhart's Return to His Community from Prison**

13. Over 16 years ago, on November 19, 2004, Mr. Averhart, who is now 39 years old, was convicted, upon a guilty plea, of rape in the first degree, N.Y. Penal Law § 130.35(1). The offense stemmed from an incident in which Mr. Averhart, then 22, engaged in forced sexual intercourse with a 14-year-old girl. Mr. Averhart was sentenced to 12 years in prison followed by five years post-release supervision. His term of post-release supervision expires in January 2023.

14. While serving his prison term, Mr. Averhart participated in a sex offender counseling and treatment program. In November 2017, he was adjudicated as a Level 3 offender under the New York Sex Offender Registration Act ("SORA"), N.Y. Corr. Law § 168-n.

15. Mr. Averhart was released from prison on December 13, 2017. A special condition of his release prohibited him from having any "contact with any person under the age of eighteen, without the written permission of [his parole officer]." Another condition of his release prohibited him from living within 1,000 feet of a school during his supervision period, in accordance with the Sexual Assault Reform Act ("SARA"), N.Y. Exec. Law §259-c(14)).

16. Prior to his release, Mr. Averhart proposed to live at the home of his mother and sister in Jamaica, Queens. DOCCS approved the address as SARA-compliant, and Mr. Averhart moved there after his release.

17. Upon his release, Mr. Averhart enrolled in a drug treatment program at the Fortune Society to help him manage his struggles with substance abuse. He was introduced to drugs and alcohol as a young teenager and has suffered from addiction ever since.

18. Through the Fortune Society, Mr. Averhart joined an 8-week culinary arts and industrial cooking training program, which led to full-time employment as an industrial cook at a homeless shelter in Manhattan.

19. During this period following his release from prison, his mother, sister, and other members of his family supported him as he worked on rehabilitation. They advised him as he began his new career, and they provided him with emotional support.

20. Mr. Averhart in turn provided much-needed assistance to his family. In addition to contributing to rent, Mr. Averhart cared for his mother, who was undergoing daily oral chemotherapy for chronic leukemia. He helped her in many ways, including running errands, taking her to her doctor's appointments, and cooking for her at home.

**Mr. Averhart Starts a Family with Jazmine McKenzie**

21. In 2018, Mr. Averhart met Jazmine McKenzie through a neighborhood acquaintance. They began dating shortly thereafter, and he remembers falling in love early on in their relationship.

22. As Mr. Averhart soon learned, Ms. McKenzie was grappling with psychological harm from a traumatic childhood and mental illness. He supported her through her struggles and made sure she was receiving the medical attention she needed.

23. Seeking independence, Mr. Averhart and Ms. McKenzie moved together to a homeless shelter on Wards Island in November 2018. The shelter was the only option available, given both his lack of resources and his SARA residency restriction. Although they were forced to sleep in different, nearby shelters, they remained inseparable.

24. Around the new year in 2019, Mr. Averhart and Ms. McKenzie were elated to learn that Ms. McKenzie was pregnant. The news brought them even closer to one another.

They were at each other's side every day, and they frequently shopped together at the Salvation Army for baby clothes and planned their future as a family.

25. Mr. Averhart had recently lost his job, however, and without income and the stable presence of his mother and sister, he began to feel overwhelmed. He suffered a relapse by drinking and using drugs. Ultimately, his struggles resulted in two violations of his conditions of supervision, in February and May 2019. After his arrest and temporary detention on both violations, administrative law judges employed by DOCCS released Mr. Averhart back to the community.

**Defendants Impose the Ban on Contact Between Mr. Averhart and His Daughter**

26. Defendant Osouna, Mr. Averhart's parole officer, drove Mr. Averhart home upon his release from incarceration following his first parole violation. During their drive, Mr. Averhart told her that Ms. McKenzie was pregnant, and that he was excited to start family and intended to get married. Defendant Osouna warned him that the marriage "was not a good idea." She also told him that his special condition of parole—that he needed written permission from his parole officer before having any contact with a minor—prohibited him from ever seeing his child. He protested, informing her that he understood that this condition applied to everyone on post-release supervision for a sex offense and that others with this condition were able to see their children. He told her he intended to take responsibility for his child and that he must be allowed contact with her. Defendant Osouna did not change her position.

27. During a follow-up meeting in approximately May 2019, Defendants Osouna and Neely, a senior parole officer, scolded Mr. Averhart for Ms. McKenzie's pregnancy and again warned him that he will "never be around [his] child" because his special condition prohibited it unless they give written permission. Once again, Mr. Averhart protested, telling her he intended to take full responsibility for raising his child, which he could not do as long as he was

prohibited from seeing her. Again, Defendants Osouna and Neely did not grant him permission to have contact with his daughter.

28. On August 22, 2019, Ms. McKenzie called Mr. Averhart from a hospital in Harlem to tell him she had gone into labor. Overjoyed to meet his newborn child, Mr. Averhart traveled to the hospital with his mother, sister, and nephew. But when he arrived at the hospital, the hospital's security staff told him that his parole officers had instructed the hospital to deny him entry.

29. The following day, Mr. Averhart traveled to a hospital in Midtown Manhattan, where Ms. McKenzie had moved, only to be denied access once again at the direction of his parole officers. Hospital security staff reported that his parole officers made them aware of Mr. Averhart's criminal history and that his contact with any minor, even his own child, was prohibited. As a consequence, Mr. Averhart could not attend his daughter's birth and he could not even sign her birth certificate.

30. After learning that Mr. Averhart could not be at her side for the birth, Ms. McKenzie became agitated and began acting erratically towards hospital staff. Worried for her safety, hospital staff transferred and admitted her to the inpatient psychiatric unit.

31. Following this incident, Ms. Peck and Ms. Watson, J.C.'s paternal aunt and grandmother, respectively took care of J.C. J.C. began living at their home on August 27, 2019, and was approved by MercyFirst, a foster care agency, for a formalized foster care placement with them in October 2019.

32. After J.C.'s placement with Ms. Peck and Ms. Watson, Defendant Osouna called Ms. Watson to tell her she would arrest Mr. Averhart if she ever sees him with J.C.

**Mr. Averhart Returns to Prison and Commits Himself to Fatherhood**

33. Upset that he could not see his child, and anxious about Ms. McKenzie's state, Mr. Averhart suffered a relapse. He checked into an inpatient rehabilitative program at Cornerstone Medical Arts, but he left the facility after only a few days.

34. His departure from Cornerstone, which had become his approved address, constituted a violation of his post-release supervision, which was revoked September 9, 2019. He was sentenced to one year in prison.

35. Mr. Averhart lacked a close relationship with his father growing up. Despite his incarceration, Mr. Averhart resolved to be present in J.C.'s life and start to build the relationship with her that he wished he had with his own father.

36. Mr. Averhart calls his mother from prison almost every day to speak to J.C. Mr. Averhart often calls in the morning just to wish J.C. a good morning, then again that same day in the afternoon. He reads to her whatever book he is reading, just so she can hear his voice, and he sings to her at night.

37. Now, at approximately 16-months-old, J.C. is learning to speak. Her first word was "dada," and whenever the phone rings, she says "dada," expecting it to be him.

**Mr. Averhart Remains Incarcerated Due to Defendants' Unconstitutional Prohibition**

38. Mr. Averhart was scheduled to be released and returned to post-release supervision on September 6, 2020.

39. In anticipation of his release, he proposed his mother and sister's house, where he had previously resided and which had already been approved as SARA-compliant, as his intended residence.

40. Defendants rejected this residence, citing J.C.'s presence in the home and his condition of parole preventing contact with her. They did not otherwise inform him of any specific reason as to why the no-contact condition was necessary.

41. There are scarce SARA-compliant housing shelters in New York City. Mr. Averhart has no other SARA-compliant housing to which he can be released.

42. As a result, he is currently incarcerated at a residential treatment facility within the Fishkill Correctional Facility, a DOCCS prison.

43. Mr. Averhart still has never met J.C. face-to-face.

44. Mr. Averhart has grown increasingly distressed and anxious as he remains incarcerated past his release date, with the knowledge that his daughter is growing up while he is kept from her, and that his mother, who is still receiving daily oral chemotherapy treatment as she battles cancer, is raising J.C. without his support. His psychological health and ability to sleep have deteriorated as a result.

**Defendants' Ban Is Unnecessary and Violates the Defendants' Own Protocol**

45. By their own admission, Defendants do not believe Mr. Averhart presents a danger to his daughter. In September 2020, Defendant Osouna sent the following text messages to Ms. Watson about J.C. and Mr. Averhart:

> I'm glad you all have her and she knows him. The next step is getting him home and him remaining home. He'll have to prove that he's on the right path before they'll allow him to see her. Believe me. None of us think he'd hurt her. He's just gotta get his head right and let her be his motivation. She needs all her family.

46. Yet this admission has not been communicated to Mr. Averhart or impacted his reunification. In fact, in anticipation of Mr. Averhart's reunification, on August 9, 2020, his counsel contested the no-contact condition in a letter, delivered by email and mail, to Kathleen M. Kiley, Counsel to the Board of Parole, which is part of DOCCS, and Defendant Parker, a

parole bureau chief. Mr. Averhart's counsel noted the absence of any individualized justification for the no-contact condition, and she requested that any condition barring Mr. Averhart's contact with his daughter be lifted so Mr. Averhart may be released on his anticipated release date to his family's home.

47. Defendants Osouna and Neely had imposed the no-contact condition only on the grounds that Mr. Averhart must receive their permission to have contact with any minor, and not that he posed a threat to his daughter. In response to Mr. Averhart's counsel's letter, however, Defendant Parker offered a different, post-hoc explanation that Mr. Averhart could not live with his daughter because of his negative adjustment to parole. But DOCCS' own protocol only permits parental restrictions to "protect a [person's] child(ren) from harm or danger."

48. DOCCS' Parental Contact Protocol (the "Protocol") creates an administrative scheme that DOCCS must follow to impose conditions of parole and post-release supervision that constrain individuals' ability to have contact with their children.

49. Under the Protocol, DOCCS must provide written notice to individuals about their ability to exercise their parental rights and the process for contesting any no-contact restriction.

50. To justify any parental restriction, DOCCS must conduct an investigation to determine whether the child at issue requires protection from danger presented by the parent. As part of the investigation, DOCCS must interview the child's other parent or caretaker, as well as "collateral sources of information as appropriate," such as sex offender treatment providers, family members, employers, and friends and family members. DOCCS must also consider the history of the person's contact with their child, including any limited contact while incarcerated, the person's risk of re-offending, and the age of the person's prior victim as compared to their child.

51. Upon the investigation's conclusion, DOCCS must determine the "least restrictive conditions reasonably necessary and appropriate for a [person] to properly exercise his or her parental rights, while protecting [the child] from harm or danger."

52. DOCCS must provide its written decision denying parental contact, and that decision must explain the reason for the denial. DOCCS must also inform the parent of their opportunity to be heard on appeal and provide a written "notice of appeal" that the parent can submit to appeal any parental restriction.

53. Defendants here failed to follow this Protocol.

54. Defendants failed to provide Mr. Averhart with any written notice of a parental restriction.

55. Defendants failed to conduct any investigation, including interviews of J.C.'s caretakers or Mr. Averhart, of whether Mr. Averhart presents a danger to his daughter to justify a parental restriction.

56. Defendants failed to consider less restrictive alternatives to a complete ban on physical contact between Mr. Averhart and J.C. or the impact the ban has on Mr. Averhart's right to live with his family.

57. Defendants failed to provide Mr. Averhart with a written determination explaining the reasons supporting their decision to impose a ban on contact. They failed to provide Mr. Averhart with information about his right to appeal the ban, a written notice of appeal, or any opportunity to be heard on why the ban is unjustified.

## JURISDICTION AND VENUE

58. This case arises under the Constitution and laws of the United States, including 42 U.S.C. § 1983. This Court has subject-matter jurisdiction under Article III of the Constitution and 28 U.S.C. §§ 1331 & 1343(a).

59. The Court has the authority to provide appropriate declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 & 2202 and Rule 65 of the Federal Rules of Civil Procedure. The Court has the authority to provide appropriate monetary damages, attorneys' fees, and costs under 42 U.S.C. §§ 1983 & 1988.

60. Venue in the Southern District of New York is proper under 28 U.S.C. § 1391(b) as a substantial part of the acts giving rise to Plaintiff's claims occurred in this District.

## CLAIMS FOR RELIEF

### First Cause of Action

Violations of Substantive Due Process

61. Defendants' actions or inactions alleged herein have violated and continue to violate Mr. Averhart's substantive due process rights under the Fourteenth Amendment of the United States Constitution.

### Second Cause of Action

Violations of Procedural Due Process

62. Defendants' actions or inactions alleged herein have violated and continue to violate Mr. Averhart's procedural due process rights under the Fourteenth Amendment of the United States Constitution.

## RELIEF REQUESTED

WHEREFORE, Plaintiff requests that the Court:

a. Assume jurisdiction of this case;

b. Declare that Defendants' prohibition of any contact between Tyrell Averhart and J.C., which has kept him from living with his family, is unconstitutional because it violates the Fourteenth Amendment's Due Process Clause;

c. Issue a preliminary and permanent injunction barring the enforcement of the challenged condition of post-release supervision prohibiting any contact between Tyrell Averhart and J.C.;

    d. Award Plaintiff monetary damages, including punitive damages, for the violations of his constitutional rights, for his pain and suffering, and to compensate him for expenses incurred as result of Defendants' actions;

    e. Award Plaintiff costs and attorneys' fees pursuant to 42 U.S.C. § 1988; and

    f. Grant such other and further relief as the Court deems just and proper.

## DEMAND FOR A JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands trial by jury in this action of all issues so triable.

Dated: January 15, 2021

Respectfully submitted,

*Attorneys for Plaintiff Tyrell Averhart*

By: /s/ Lisa E. Cleary

| | |
|---|---|
| Philip Desgranges | Lisa E. Cleary |
| Tomoeh Murakami Tse | Jonathan S. Z. Hermann |
| Will A. Page | PATTERSON BELKNAP |
| Corey Stoughton |   WEBB & TYLER LLP |
| THE LEGAL AID SOCIETY | 133 Avenue of the Americas |
| 199 Water Street, 5th Floor | New York, New York 10036 |
| New York, New York 10038 | Tel: 212.336.2000 |
| Tel: 212.577.3300 | lecleary@pbwt.om |
| pdesgranges@legal-aid.org | jhermann@pbwt.com |
| tmurakamitse@legal-aid.org | |
| wpage@legal-aid.org | |
| cstoughton@legal-aid.org | |