UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| TYRELL AVERHART,<br><br>Plaintiff,<br><br>– against –<br><br>ANTHONY J. ANNUCCI, Acting Commissioner of the New York State Department of Corrections and Community Supervision; Bureau Chief MARK PARKER; Senior Parole Officer CLARENCE R. NEELY; and Parole Officer LINDSY OSOUNA,<br><br>Defendants. | 21 Civ. 383 (NSR) |

## PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF HIS MOTION FOR PRELIMINARY INJUNCTION

| | |
|---|---|
| **THE LEGAL AID SOCIETY**<br>Philip Desgranges<br>Tomoeh Murakami Tse<br>Will A. Page<br>Corey Stoughton<br>199 Water Street, 5th Floor<br>New York, New York 10038<br>Tel: 212.577.3367 | **PATTERSON BELKNAP<br>   WEBB & TYLER LLP**<br>Lisa E. Cleary<br>Jonathan S. Z. Hermann<br>133 Avenue of the Americas<br>New York, New York 10036<br>Tel: 212.336.2000 |

Dated: January 20, 2021
           New York, N.Y.

# **TABLE OF CONTENTS**

**INTRODUCTION** ................................................................................................................................ 1

**STATEMENT OF FACTS** ................................................................................................................. 2

**ARGUMENT** ....................................................................................................................................... 7

I.     Depriving Mr. Averhart of His Fundamental Rights to Associate with
   His Child and Live with His Family is Causing Irreparable Harm ..................................... 8

II.    Well-Established Supreme Court and Second Circuit Precedent on the
   Fundamental Right to Familial Association Ensures that Mr. Averhart Is
   Likely to Succeed on His Due Process Challenge of the Defendants' Ban ...................... 10

III.   The Balance of Equities Weighs Decisively in Favor of Injunctive Relief,
   Which Is in the Public Interest .......................................................................................... 13

**CONCLUSION** ................................................................................................................................ 15

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Benihana, Inc. v. Benihana of Tokyo, LLC*,
   784 F.3d 887 (2d Cir. 2015)...................................................................................................7

*Cleveland Bd. of Ed. v. LaFleur*,
   414 U.S. 6320 (1974)..........................................................................................................8, 10

*CompassCare v. Cuomo*,
   465 F. Supp. 3d 122 (N.D.N.Y. 2020)...................................................................................14

*Conn. Dep't of Envtl. Prot. v. Occupational Safety & Health Admin.*,
   356 F.3d 226 (2d Cir. 2004)....................................................................................................8

*Doe v. Cappiello*,
   758 F. App'x 181 (2d Cir. 2019) .....................................................................................11, 12

*Doe v. Lima*,
   270 F. Supp. 3d 684 (S.D.N.Y. 2017), *aff'd sub nom. Doe v. Cappiello*, 758 F.
   App'x 181 (2d Cir. 2019).................................................................................................12, 13

*Doe v. Smith*,
   No. 5:06-cv-121 (FJS) (DEP), 2006 WL 383514 (N.D.N.Y. Feb. 16, 2006)............7, 9, 12, 13

*Duchesne v. Sugarman*,
   566 F.2d 817 (2d Cir. 1977)....................................................................................................9

*Eschbach v. Eschbach*,
   56 N.Y.2d 167 (1982) ...........................................................................................................14

*People ex rel. Johnson v. Superintendent, Adirondack Corr. Facility*,
   —N.E.3d—, 2020 WL 6828834 (N.Y. Nov. 23, 2020).......................................................5, 6

*Lehr v. Robertson*,
   463 U.S. 248 (1983)..............................................................................................................11

*Marquez v. Annucci*,
   No. 20-cv-1974, 2020 WL 3871362 (S.D.N.Y. July 9, 2020)...........................................7, 14

*Mastrovincenzo v. City of New York*,
   435 F.3d 78 (2d Cir. 2006)......................................................................................................7

*Moore v. City of E. Cleveland*,
   431 U.S. 494 (1977)..............................................................................................................10

*Mullins v. City of New York*,
   626 F.3d 47 (2d Cir. 2010)......................................................................................................2

## **TABLE OF AUTHORITIES**

**Page**

*Pearson Educ., Inc. v. Labos*,
  No. 19 CIV. 487 (CM), 2019 WL 1949820 (S.D.N.Y. Apr. 23, 2019) ...................... 8

*Peralta-Veras v. Ashcroft*,
  No. 02-cv-1840 (IRR), 2002 WL 1267998 (E.D.N.Y. Mar. 29, 2002) ...................... 9

*Planned Parenthood of N.Y.C., Inc. v. U.S. Dep't of Health & Human Servs.*,
  337 F. Supp. 3d 308 (S.D.N.Y. 2018) ............................................................... 13

*Reuters Ltd. v. United Press Int'l, Inc.*,
  903 F.2d 904 (2d Cir. 1990) ............................................................................ 8

*Sajous v. Decker*,
  No. 18-cv-2447, 2018 WL 2357266 (S.D.N.Y. May 23, 2018) ............................ 14

*Santosky v. Kramer*,
  455 U.S. 745 (1982) ...................................................................................... 11

*Tremper v. Ulster Cty. Dep't of Prob.*,
  160 F. Supp. 2d 352 (N.D.N.Y. 2001) ............................................................... 9

*Troxel v. Granville*,
  530 U.S. 57 (2000) ................................................................................... 8, 10

*United States v. Myers*,
  426 F.3d 117 (2d Cir. 2005) ...................................................................... 10, 11

**Statutes**

N.Y. Exec. Law §259-c(14) ................................................................................ 2

N.Y. Penal Law § 130.35(1) ............................................................................... 2

N.Y. Corr. Law § 168-n ..................................................................................... 2

**INTRODUCTION**

This motion asks the Court to preliminarily enjoin an unconstitutional condition of post-release supervision imposed by officials of New York State's Department of Corrections and Community Supervision ("DOCCS") that has prohibited Plaintiff Tyrell Averhart from seeing his 16 month-old daughter since she was born. It is well-established in this circuit that because this condition implicates Mr. Averhart's fundamental due process rights to associate with and raise his daughter and live with his family, defendants must establish that it is the least restrictive alternative to serve a compelling interest relating to the safety of the child. Because defendants have conceded that Mr. Averhart does not pose a threat to his daughter, and because defendants never made any individualized determination of risk or explored less restrictive options, the ban is unconstitutional.

When Mr. Averhart's term of incarceration expired in September 2020, defendants rejected his request to be released to his family's home, where his daughter lives, because of the ban on his contact with her. Constrained by residency restrictions because of his designation as a sex offender and with no other viable address, Mr. Averhart has remained in prison months after his release date.

The ban on contact has caused and continues to cause irreparable harm to Mr. Averhart, his daughter, and his family by depriving them of family relationships and keeping Mr. Averhart incarcerated. Furthermore, the balance of the equities weighs decidedly in Mr. Averhart's favor because the unconstitutional ban undermines the state's interests in Mr. Averhart's rehabilitation and promoting the best interests of his daughter. Any remaining state interest in controlling Mr. Averhart's interactions with his family can be addressed through less restrictive alternative conditions of supervision. Mr. Averhart therefore respectfully urges this Court to enter a

preliminary injunction prohibiting the enforcement of the ban on contact, thereby allowing Mr. Averhart to live with his daughter and his family during the pendency of this litigation and ending his already unnecessarily prolonged incarceration past his release date.

## STATEMENT OF FACTS[1]

Mr. Averhart is 39 years old.  Averhart Decl. ¶ 1.  He is the father of J.C., his 16-month-old daughter. *Id.* ¶ 3.  His mother, Beverly Watson, and his sister, Syderia Peck, currently care for J.C.  *Id.* ¶ 46; Watson Decl. ¶¶ 3–4, 15.  Over 16 years ago, on November 19, 2004, Mr. Averhart was convicted, upon a guilty plea, of rape in the first degree, N.Y. Penal Law § 130.35(1), Hermann Decl., Ex. A, at 6, following an incident in which Mr. Averhart, then 22, engaged in forced sexual intercourse with a 14-year-old girl.  *Id.*, Ex. B, at 6.  Mr. Averhart's conviction resulted in a 12-year prison sentence followed by five years' post-release supervision ("PRS").  *Id.*, Ex. A, at 7.  He was adjudicated in November 2017 as a Level 3 offender under the New York Sex Offender Registration Act ("SORA"), N.Y. Corr. Law § 168-n.  *Id.*, Ex. C.

Mr. Averhart was released from prison on December 13, 2017.  *Id.*, Ex. B, at 15.  A condition of his release prohibited him from having any "contact with any person under the age of eighteen, without the written permission of [his parole officer]."  *Id.*, Ex. B, at 11.  Another condition of his release prohibited him from living within 1,000 feet of a school, in accordance with the Sexual Assault Reform Act ("SARA").  *Id.*, Ex. B, at 13–14, 16; *see* N.Y. Exec. Law §259-c(14)).  After Mr. Averhart proposed to live at the home of his mother and sister in Jamaica, Queens, the Board of Parole approved the address as SARA-compliant and Mr.

---

[1] In support of his motion, Mr. Averhart submits declarations from himself, his mother, and supporting exhibits.  *See* Decl. of Tyrell Averhart Supp. Pls.' Mot. For Prelim. Inj. ("Averhart Decl.") (December 23, 2020); Decl. of Beverly Watson Supp. Pls.' Mot. For Prelim. Inj. ("Watson Decl.") (January 14, 2021); Decl. of Jonathan Hermann Supp. Pls.' Mot. For Prelim. Inj. ("Hermann Decl.") (January 20, 2021).  Because the preliminary injunction procedure is less formal than trial, this Court may consider hearsay evidence in granting plaintiff's relief.  *See Mullins v. City of New York*, 626 F.3d 47, 52 (2d Cir. 2010).

Averhart moved there after his release. Averhart Decl. ¶ 11; Hermann Decl., Ex. B, at 10. Returning home, he helped care for his mother, who had been diagnosed with chronic leukemia and was receiving daily oral chemotherapy. Averhart Decl. ¶ 19; Watson Decl. ¶ 8. At the same time, his mother, sister, and other members of his family gave him strength and support as he rehabilitated. Averhart Decl. ¶ 22; Watson Decl. ¶ 10–13. They advised him as he began his new career, and they provided him with invaluable emotional support through their sharing with him a loving familial household. Averhart Decl. ¶¶ 12–13, 22.

Defendant Osouna has been Mr. Averhart's parole officer since his release from prison. Averhart Decl. ¶ 16. Around the 2019 new year, Mr. Averhart and his partner Jazmine McKenzie learned that Ms. McKenzie was pregnant. Averhart Decl. ¶ 28; Watson Decl. ¶ 10. Mr. Averhart informed Defendant Osouna of his relationship with Ms. McKenzie, her pregnancy, and his intention to marry her. Averhart Decl. ¶ 31. Citing his condition of parole that he needed written permission before having any contact with a minor, Defendant Osouna told him he would be prohibited from being around any children, including his own. *Id.*

During one of Mr. Averhart's parole visits in the following months, Defendants Osouna and Neely, a senior parole officer, scolded Mr. Averhart for Ms. McKenzie's pregnancy, and again warned him that he will "never be around [his] child." *Id.* ¶ 33. They did not memorialize any specific prohibition relating to his child as a condition of his parole, relying instead on the condition generally prohibiting him from being around minors without prior written permission. *Id.*; Hermann Decl., Ex. B, at 11.

On August 22, 2019, Ms. McKenzie went into labor. Averhart Decl. ¶ 35; Watson Decl. ¶ 12. Mr. Averhart traveled to the hospital with his mother, sister, and nephew, only to be denied entry by the hospital's security staff on the instruction of his parole officer. Averhart Decl. ¶ 36;

3

Watson Decl. ¶ 12. The following day, Mr. Averhart traveled to another hospital where Ms. McKenzie had been moved prior to the birth but was again denied access at the direction of his parole officer. Averhart Decl. ¶ 38; Watson Decl. ¶ 13. After Mr. Averhart was prohibited from joining Ms. McKenzie, the birth became too much for her to bear. Watson Decl. ¶ 15. She became agitated and began acting erratically towards hospital staff. *Id.* The hospital staff transferred and admitted her to the inpatient psychiatric unit. *Id.* Because of this, the child, J.C., was placed in the care of Ms. Peck and Ms. Watson, J.C.'s paternal aunt and grandmother, respectively. Watson Decl. ¶ 15.

As a consequence of this no-contact condition, Mr. Averhart was excluded from his daughter's birth—he was not even allowed to sign her birth certificate—and has not been allowed to see her since. Averhart Decl. ¶¶ 38–39; Watson Decl. ¶ 14. Defendant Osouna later told Mr. Averhart's mother that she would arrest him if she ever saw him with his child. Watson Decl. ¶ 16.

The no-contact condition also meant that Mr. Averhart could not return to his family's home following J.C.'s birth. Averhart Decl. ¶¶ 46, 49. Mr. Averhart has struggled with addiction, having been introduced to drugs and alcohol at a young age, and he suffered relapses during his PRS period, leading to two parole violations and subsequent rehabilitative treatment. *Id.* ¶¶ 8, 29–30, 34. Following J.C.'s birth, Mr. Averhart again suffered a relapse and checked himself into an inpatient rehabilitation facility, but he left after only a few days. *Id.* ¶¶ 40–41. His departure from the rehabilitation facility, which had become his approved address, constituted a violation of his parole, which was revoked on September 9, 2019. *Id.* ¶ 41–42; Hermann Decl., Ex. B, at 5, 7. He was sentenced to one year in prison, where he has remained sober for the entirety of his incarceration. Averhart Decl. ¶¶ 42–43.

4

As a child, Mr. Averhart was not close to his own father, but when J.C. was born, Mr. Averhart committed to building the relationship with J.C. he wished he had with his own father and resolved to be present in J.C.'s life in spite of his incarceration. *Id.* ¶ 45–46. He calls his mother from prison almost every day, and often multiple times a day, to speak to J.C. Averhart Decl. ¶ 46; Watson Decl. ¶¶ 19–21. He reads to J.C. whatever book he is reading, just so she can hear his voice. Averhart Decl. ¶ 46; Watson Decl. ¶ 20. He also tells her a tale of an African prince who has wealth beyond measure, but who cares only about his greatest treasure of all—that treasure, he tells J.C., is her. Averhart Decl. ¶ 46. At night, Mr. Averhart calls to sing J.C. nursery rhymes until she falls asleep. *Id.*; Watson Decl. ¶ 20. Now, at approximately 16 months old, J.C. is learning to speak, and she asks for "dada"—her first word—each time the phone rings. Watson Decl. ¶ 21.

In anticipation of his release on September 6, 2020, Mr. Averhart proposed to live in his family home, where he had previously resided and which had previously been approved as SARA-compliant. Averhart Decl. ¶ 49. Defendants rejected this proposal, citing J.C.'s presence there. *Id.* Because of space limitations at SARA-compliant men's shelters, Mr. Averhart has no other viable alternative address. *Id.*; *see People ex rel. Johnson v. Superintendent, Adirondack Corr. Facility*, —N.E.3d—, 2020 WL 6828834, at *8 (N.Y. Nov. 23, 2020) (describing DOCCS's waiting list to be released to a SARA-compliant shelter, and noting that the plaintiff remained incarcerated for over two years while awaiting space at a shelter). Instead, he remains incarcerated at Fishkill Correctional Facility. Averhart Decl. ¶ 49.

In interpreting Mr. Averhart's parole conditions to bar contact with his daughter, defendants did not follow DOCCS's Parental Contact Protocol, which creates an administrative procedure to determine whether a condition of parole limiting or prohibiting contact between a

5

releasee and his or her child reasonably balances parental rights with the protection of the child. Hermann Decl., Ex. D (the "Protocol"). Under the Protocol, DOCCS must provide written notice to individuals about the process for exercising their parental rights and whether it intends to impose a parental restriction. To justify any parental restriction, DOCCS must conduct a thorough investigation to determine whether the child requires protection from danger presented by the individual. *See id.* at 2–3. As part of the investigation, DOCCS must consider the history of the person's contact with his or her child, including any limited contact while incarcerated, the person's risk of re-offending, and the age of the person's prior victim as compared to his or her child. *Id.* at 4. Upon its conclusion, the investigation must determine the "least restrictive conditions reasonably necessary and appropriate for a [person] to properly exercise his or her parental rights, while protecting [the child] from harm or danger." *Id.* at 3.

DOCCS did none of this in Mr. Averhart's case either in 2019, when his parole officers barred him from attending his daughter's birth, or in 2020, when the condition was applied to prevent his release from prison. *See* Watson Decl., ¶ 25. On August 9, 2020, in anticipation of Mr. Averhart's release, Mr. Averhart's counsel sent a letter to Defendant Parker, copying DOCCS Parole Board Counsel Kathleen M. Kiley, contesting the ban and asking for its immediate lifting in the absence of any individualized justification. Hermann Decl., Exs. E, F. Defendants neither lifted the ban nor conducted any investigation pursuant to the Protocol's mandates.

Far from reaching an individualized determination that Mr. Averhart poses a risk to his daughter, defendants have admitted that he does not. In September 2020, Defendant Osouna sent the following text messages to Ms. Watson about J.C.:

> I'm glad you all have her and she knows him. The next step is getting him home and him remaining home.

> He'll have to prove that he's on the right path before they'll allow him to see her.
> Believe me. None of us think he'd hurt her. He's just gotta get his head right and let her be his motivation.
> She needs all her family.

Watson Decl., Ex. A.

## ARGUMENT

Mr. Averhart is entitled to a preliminary injunction barring defendants' enforcement of their ban on contact with his daughter. *Mastrovincenzo v. City of New York*, 435 F.3d 78, 89 (2d Cir. 2006); *see also Marquez v. Annucci*, No. 20-cv-1974, 2020 WL 3871362, at *5 (S.D.N.Y. July 9, 2020) (finding an injunction preventing DOCCS from enforcing its ban on contact as a condition of supervision constitutes a prohibitory injunction); *Doe v. Smith*, No. 5:06-cv-121 (FJS) (DEP), 2006 WL 383514, at *1 n.4 (N.D.N.Y. Feb. 16, 2006) (same). To prevail, Mr. Averhart must demonstrate "(1) a likelihood of success on the merits . . . ; (2) a likelihood of irreparable injury in the absence of an injunction; (3) that the balance of hardships tips in the plaintiff's favor; and (4) that the public interest would not be disserved by the issuance of an injunction." *Benihana, Inc. v. Benihana of Tokyo, LLC*, 784 F.3d 887, 895 (2d Cir. 2015) (internal quotation marks omitted).

Mr. Averhart satisfies each factor. First, he, his daughter, and his family continue to suffer irreparable harm as a result of the ban on contact, which deprives them of their right to family life and has prevented his release from prison and into his family's home. Second, controlling Supreme Court and Second Circuit case law establishes a strong likelihood of success on the merits of Mr. Averhart's substantive due process claim for deprivation of his fundamental familial rights based on the lack of any individualized determination that Mr. Averhart poses a threat to his daughter, and, indeed, defendants' admission that he does not, as well as their failure to consider any less restrictive alternatives. Finally, an injunction against the ban is decidedly in

the public's interest and would not cause defendants any hardship, as neither defendants nor the public maintain an interest in continuing Mr. Averhart's unjustified incarceration, which has prevented him from raising his daughter, caring for his ailing mother, and reentering into his community as a productive and law-abiding member of society, and whatever state interest exists in controlling Mr. Averhart's familial relationships can be addressed through less restrictive alternatives.

### I. Depriving Mr. Averhart of His Fundamental Rights to Associate with His Child and Live with His Family is Causing Irreparable Harm.

Mr. Averhart is irreparably harmed by the deprivation of his constitutional right to maintain close bonds with his family and by his ongoing incarceration, both direct results of defendants' no-contact condition. "A showing of irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction." *Pearson Educ., Inc. v. Labos*, No. 19 CIV. 487 (CM), 2019 WL 1949820, at *5 (S.D.N.Y. Apr. 23, 2019) (quotation marks and citation omitted). The harm alleged must "be imminent, not remote or speculative" and "incapable of being fully remedied by monetary damages." *Reuters Ltd. v. United Press Int'l, Inc.*, 903 F.2d 904, 907 (2d Cir. 1990). An allegation that the state has deprived a plaintiff of a constitutional right triggers a finding of irreparable harm. *Conn. Dep't of Envtl. Prot. v. Occupational Safety & Health Admin.*, 356 F.3d 226, 231 (2d Cir. 2004) (holding that the denial of a fundamental right, even for a short period, constitutes an irreparable injury).

Defendants' ban deprives Mr. Averhart of his fundamental rights to maintain close parental bonds with and raise his child and live with his family. *Troxel v. Granville*, 530 U.S. 57, 65 (2000) (recognizing "the interest of parents in the care, custody, and control of their children" as "perhaps the oldest of the fundamental liberty interests recognized by this Court"); *Cleveland Bd. of Ed. v. LaFleur*, 414 U.S. 632, 639–40 (1974) (recognizing the "personal

choice[s] in matters of . . . family life" as a fundamental liberty). Applying this well-settled precedent, other courts have found irreparable harm in precisely this circumstance, where people on probation challenge a condition that prevents them from participating in their children's lives. *See, e.g.*, *Tremper v. Ulster Cty. Dep't of Prob.*, 160 F. Supp. 2d 352, 356 (N.D.N.Y. 2001) (irreparable harm undisputed where a condition of release prohibited probationer from having contact with her child's father, thus preventing her from living with and raising her child); *Smith*, 2006 WL 383514, at *2 (finding irreparable harm where a probation condition barred plaintiff from contact with his daughter).

The ban here irreparably harms both Mr. Averhart, who is unnecessarily incarcerated past his release date, *see Peralta-Veras v. Ashcroft*, No. 02-cv-1840 (IRR), 2002 WL 1267998, at *6 (E.D.N.Y. Mar. 29, 2002) ("The deprivation of . . . liberty is, in and of itself, irreparable harm."), and his daughter, who is deprived of a parent during this critical stage of her development. *See Duchesne v. Sugarman*, 566 F.2d 817, 825 (2d Cir. 1977) (The due process right "to the preservation of family integrity encompasses the reciprocal rights of both parent and children," including the interest of "children in not being dislocated from the emotional attachments that derive from the intimacy of daily association, with the parent" (internal citations and quotation marks omitted)). As studies show, separating J.C. from her father for years until his PRS period ends will cause her long-lasting emotional and psychological harm. *See* Hermann Decl., Ex. G, Kristin Turney, *Stress Proliferation Across Generations? Examining the Relationship Between Parental Incarceration and Childhood Health*, 55 Journal of Health and Soc. Behavior 302, 314 (2014) (noting the damaging life-long effects of a parent's incarceration on a child's mental health and psychological development); Hermann Decl., Ex. H, Elizabeth Gifford et al.,

9

*Association of Parental Incarceration With Psychiatric and Functional Outcomes of Young Adults*, JAMA Network Open 5, 8 (Aug. 23, 2019) (same).

### II. Well-Established Supreme Court and Second Circuit Precedent on the Fundamental Right to Familial Association Ensures that Mr. Averhart Is Likely to Succeed on His Due Process Challenge of the Defendants' Ban.

Mr. Averhart is likely to succeed on the merits of his substantive due process claim because defendants conducted no individualized assessment of risk or of the availability of less restrictive alternatives and, indeed, defendants have conceded that Mr. Averhart poses no risk to his child. Courts in this circuit have repeatedly struck down similar conditions of parole and post-release supervision in such circumstances as failing to meet the strict scrutiny standard applicable to deprivations of the fundamental right to familial relationships.

The substantive component of the Due Process Clause "provides heightened protection against government interference with certain fundamental rights and liberty interests." *Troxel*, 530 U.S. at 65 (internal citation and quotation marks omitted). Mr. Averhart seeks to exercise his fundamental liberty interest in "in the care, custody, and control of [his] children . . . perhaps the oldest of the fundamental liberty interests recognized by [the Supreme Court]." *Id.* He also challenges the ban's ancillary effect of depriving him of his fundamental right to live with, care for, and be supported by the rest of his family. *See LaFleur*, 414 U.S. at 639–40 (recognizing the "personal choice[s] in matters of . . . family life" as a fundamental liberty); *Moore v. City of E. Cleveland*, 431 U.S. 494, 499 (1977) (same).

It is well-established in the Second Circuit that a parole condition infringing on a parent's contact with his or her child, like the one at issue here, is subject to strict scrutiny and is thus prohibited, regardless of the process afforded, unless narrowly tailored to serve a compelling government interest. In *United States v. Myers*, 426 F.3d 117 (2d Cir. 2005), the Second Circuit

10

held that a condition of federal supervised release interfering with "a parent's interest in maintaining a relationship with his or her child" is subject to "careful[] examin[ation]" to ensure that the deprivation "is narrowly tailored to serve a compelling government interest." *Id. at* 125–26 (citation omitted). The Second Circuit has required that state parole conditions interfering with parental-child relationships withstand the same strict scrutiny requirement. *Doe v. Cappiello*, 758 F. App'x 181, 184 (2d Cir. 2019) (summary order) (examining state parole conditions and finding that *Myers* established that conditions interfering with the right of familial association "must satisfy strict scrutiny").

Here, Mr. Averhart's interest in being with and raising his daughter is entitled to due process protection because he sought to participate in the rearing of his daughter at every stage of her life, from the time of her birth, through his incarceration, and now upon his release from prison. *See* Averhart Decl. ¶¶ 35–39, 45–46, 48–49. In spite of the ban on physical contact and the distance imposed by his incarceration, Mr. Averhart has committed to rearing J.C., often calling multiple times a day to speak, read, and sing to her, and he seeks to raise her upon his release. Averhart Decl. ¶ 45–46, 49; Watson Decl. ¶ 20. As the declarations from Mr. Averhart and J.C.'s custodian establish, he has succeeded remarkably in establishing a positive presence in his young daughter's life, despite formidable obstacles. As the Supreme Court recognized, "[w]hen an unwed father demonstrates a full commitment to the responsibilities of parenthood by com[ing] forward to participate in the rearing of his child, his interest in personal contact with his child acquires *substantial* protection under the due process clause." *Lehr v. Robertson*, 463 U.S. 248, 261 (1983) (citation and internal quotation marks omitted) (emphasis added); s*ee also Santosky v. Kramer*, 455 U.S. 745, 753–54 (1982) ("The fundamental liberty interest of natural

11

parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child.").

Applying circuit precedent, courts have consistently struck down conditions of supervised release that restricted a parent's access to his or her child where, as here, they are not based on an individualized assessment of a specific threat to the child. In *Doe v. Lima*, for example, the Southern District held that "parole conditions that bar a parent from all contact with a child or condition such contact on a parole officer's approval . . . require individualized justification based on the threat posed by the [parolee] to the child." *Doe v. Lima*, 270 F. Supp. 3d 684, 703 (S.D.N.Y. 2017), *aff'd sub nom. Doe v. Cappiello*, 758 F. App'x 181 (2d Cir. 2019). As is the case here, the parole condition at issue in *Lima* barred a registered sex offender from contact with a minor without the permission of his parole officer, and parole officials relied on that condition to ban that plaintiff from having contact with his child on two occasions, thus forcing him out of his SARA-compliant home. *Lima*, 270 F. Supp. at 704. The court recognized that a parental restriction is permitted to advance the government's compelling interest in protecting the plaintiff's child if it investigated and found that such a restriction was justified. *Id.* But the court held that the plaintiff's no-contact condition "was neither factually justified nor narrowly tailored at all" because parole officials "did negligible investigation," the evidence obtained by parole officials "*disfavored* a ban," and officials "did not consider whether the lesser alternative of restricted contact . . . could be justified." *Id.* at 704–05 (emphasis in original). As a result, the court found the no-contact condition violated substantive due process. *Id.* at 704; *see also Smith*, 2006 WL 383514, at *2 (finding that a ban on contact imposed as a condition of probation violates substantive due process because there was no evidence to justify the ban).

12

The evidence similarly disfavors the ban here. Defendant Osouna admitted that Mr. Averhart poses no danger to J.C. because no one from DOCCS "think[s] he'd hurt her." Watson Decl., Ex. A. And, as in *Lima*, defendants failed to conduct any factual investigation into Mr. Averhart's risk level, in violation of their own Protocol, to determine whether a ban on contact is justified or whether it represents the "least restrictive condition[] reasonably necessary and appropriate for [Mr. Averhart] to properly exercise his . . . parental rights, while protecting [the child] from harm or danger." Hermann Decl., Ex. D, at 3.

Moreover, Mr. Averhart's underlying conviction, which involved a teenage victim unrelated to him, fails to establish any risk to J.C. *See* Hermann Decl., Ex. B, at 7; *see also Lima*, 270 F. Supp. 3d at 705–06 (finding that facts showing the victim of plaintiff's rape conviction was an adolescent while plaintiff's child is a newborn disfavored a ban); *Smith*, 2006 WL 383514, at *3 (finding that the difference in age between the plaintiff's infant child and the victim of his underlying crime undermined the likelihood of harm to his child). Consistent with Defendant Osouna's admission, Mr. Averhart has demonstrated a deep commitment to caring for J.C.'s wellbeing even while incarcerated. Averhart Decl. ¶ 46; Watson Decl. ¶¶ 19–21. In the absence of any meaningful investigation or any individualized finding that Mr. Averhart presents a danger to his daughter, and in light of defendants' admission and other evidence demonstrating he presents no danger, the ban is "sufficiently arbitrary and egregious to violate substantive due process." *Lima*, 270 F. Supp. at 704.

### III. The Balance of Equities Weighs Decisively in Favor of Injunctive Relief, Which Is in the Public Interest.

Where, as here, a plaintiff seeks to enjoin the government, the final two factors—the balance of equities and the public's interests—merge into a single inquiry. *Planned Parenthood*

of N.Y.C., Inc. v. U.S. Dep't of Health & Human Servs.*, 337 F. Supp. 3d 308, 343 (S.D.N.Y. 2018).

The unconstitutionality of the ban, which defendants continue to enforce even after admitting it serves no protective purpose, tips the scales decidedly in Mr. Averhart's favor. The "public interest is best served by ensuring the constitutional rights of persons within the United States are upheld," and the balance of hardships strongly favors those suffering from a constitutional deprivation by the state. *Sajous v. Decker*, No. 18-cv-2447, 2018 WL 2357266, at *13 (S.D.N.Y. May 23, 2018).

The harmful effect of Mr. Averhart's constitutional deprivation is amplified by the fact that it has kept him from his mother, who still receives daily chemotherapy, and who now bears the additional burden of caring for J.C. in his absence. Averhart Decl. ¶ 47; Watson Decl. ¶ 22. When he lived at home during his PRS period, he contributed to rent and provided much-needed assistance around the home, including easing his mother's day-to-day burdens by cooking for her and for his family, retrieving her medications, and making repairs around the house. Averhart Decl. ¶ 19; Watson Decl. ¶¶ 7–8. Now unable to care for either his mother or daughter, he experiences an increasing sense of anxiety and anguish with each day he is kept away from living with them. Averhart Decl. ¶ 50. The ban has also harmfully disrupted Mr. Averhart's reentry into his community by keeping him imprisoned months past his September release date, thus thwarting the public's interest in seeing that Mr. Averhart will once again become a productive and law-abiding member of society. *See Marquez*, 2020 WL 3871362, at *6.

For the same reasons, defendants will suffer no hardship in lifting the ban on contact. Not only does the state lack an interest in the enforcement of an unconstitutional condition, *CompassCare v. Cuomo*, 465 F. Supp. 3d 122, 159 (N.D.N.Y. 2020), but the forced separation of

14

J.C. from her father undermines her best interests, which are of paramount concern to the state. *See Eschbach v. Eschbach*, 56 N.Y.2d 167, 171 (1982) (holding that questions of child custody must be guided by "what is for the best interest of the child, and what will best promote its welfare and happiness") (internal citation omitted). Moreover, even if Mr. Averhart poses any risk to J.C.—which defendants concede and which the evidence shows he does not—the striking down of this complete ban does not strip DOCCS of its authority to impose less restrictive conditions that balance J.C.'s protection with Mr. Averhart's right to parent her. *See* Hermann Decl., Ex. D, at 3. Consequently, a preliminary injunction will not jeopardize any compelling state interest.

## CONCLUSION

For the above-stated reasons, the Court should grant Mr. Averhart's motion for a preliminary injunction prohibiting defendants from enforcing the ban on contact between Mr. Averhart and his infant daughter.

DATED:   New York, New York
         January 20, 2021

Respectfully submitted,

*Attorneys for Plaintiff Tyrell Averhart*

By: /s/ Lisa E. Cleary
    _____

Philip Desgranges
Tomoeh Murakami Tse
Will A. Page
Corey Stoughton
THE LEGAL AID SOCIETY
199 Water Street, 5th Floor
New York, New York 10038

Lisa E. Cleary
Jonathan S. Z. Hermann
PATTERSON BELKNAP
   WEBB & TYLER LLP
133 Avenue of the Americas
New York, New York 10036
Tel: 212.336.2000

15

Tel: 212.577.3367
pdesgranges@legal-aid.org
tmurakamitse@legal-aid.org
wpage@legal-aid.org
cstoughton@legal-aid.org

lecleary@pbwt.om
jhermann@pbwt.com