UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 6/10/2021
```

TYRELL AVERHART,

                              Plaintiff,

      -against-

ANTHONY J. ANNUCCI, *Acting Commissioner of the New York State Department of Corrections and Community Supervision*; MARK PARKER, *Bureau Chief*; CLARENCE R. NEELY, *Senior Parole Officer*; & LINDSY OSOUNA, *Parole Officer*,

                              Defendants.

No. 21-cv-383 (NSR)
**OPINION & ORDER**

NELSON S. ROMÁN, United States District Judge:

   Plaintiff Tyrell Averhart ("Averhart" or "Plaintiff"), presently incarcerated at Fishkill Residential Treatment Facility ("Fishkill RTF") pending identification of suitable post-release housing, commenced this action pursuant to 42 U.S.C. § 1983 ("Section 1983") against Defendants Anthony J. Annucci ("Commissioner Annucci"), Bureau Chief Mark Parker ("Chief Parker"), Senior Parole Officer Clarence R. Neely ("Officer Neely"), and Parole Officer Lindsy Osouna ("Officer Osouna") on January 15, 2021.  (*See* Compl. (ECF No. 1).)  Prior to Plaintiff's current incarceration, in or around August 23, 2019, Defendants restricted Plaintiff from having any physical contact with his biological daughter (referred to herein as "J.C.").  At present, Defendants restrict Plaintiff from visiting J.C. outside the presence of an approved monitor and refuse to approve his mother's home as Plaintiff's post-release residence due to J.C.'s presence at the home.  Plaintiff alleges that Defendants' conduct violates his substantive and procedural due process rights by, among other things, interfering with his right to familial association with his daughter.  (*See* Compl.)

1

Presently before the Court is Plaintiff's application for a preliminary injunction restraining Defendants from enforcing: (1) a condition of release barring any contact between Plaintiff and J.C.; and (2) a condition of release requiring supervision for any visitation between Plaintiff and J.C. (*See* Notice of Motion (ECF No. 32); Memorandum of Law in Support of Motion for Preliminary Injunction ("Pl's Mem.") (ECF No. 36); Plaintiff's Reply Memorandum in Further Support of his Motion for Preliminary Injunction ("Pl's Reply") (ECF No. 42).)   Defendants oppose the application. (Defendants' Memorandum of Law in Opposition to Motion for Preliminary Injunction ("Defs' Opp.") (ECF No. 37).)   The Court has carefully reviewed the parties' submissions and considered the arguments made by both parties at a telephonic hearing held on March 25, 2021.   (Minute Entry dated March 25, 2021.)   For the following reasons, Plaintiff's application is GRANTED in part and DENIED in part.

In sum, Plaintiff's application is granted to the extent it seeks to: (1) enjoin Defendants from enforcing a condition of release barring him from any contact with J.C.; and (2) enjoin Defendants from enforcing a condition of release requiring supervised visitation with J.C. but only to the extent it is based upon a constitutionally deficient investigation; stated differently, Defendants must now conduct a new investigation into Plaintiff's parental contact request and may thereafter require supervised visitation or opt for a lesser restriction or no restriction based upon their findings.   Plaintiff's application is denied to the extent it seeks to immediately enjoin Defendants from enforcing a condition of supervised visitation and thereupon require his immediate release from incarceration (which Plaintiff disclaims in any event) as such relief is not cognizable in a Section 1983 claim.

## **FACTUAL BACKGROUND**

The factual background provided herein has been drawn from the Complaint, and the declarations and attached exhibits provided by the parties in their motion papers.

I. **Plaintiff's Prosecution for The Kidnap and Rape of an Unrelated Female Minor in 2004**

On June 9, 2004, Plaintiff, then age twenty-two, was arraigned in Kings County Criminal Court for numerous offenses arising from his alleged kidnapping, rape, and attempted sexual trafficking of a fourteen-year old girl. (Hermann Declaration Ex. A ("Averhart Repository") (ECF No. 33-1) at 4-5.) The highest charge was Rape in the First Degree: Forcible Compulsion under New York Penal Law Section 130.35(1), but he was also arraigned on related charges including, Attempting to Promote Prostitution in the Second Degree of a person less than 16 years old under New York Penal Law Section 230.30(2) and Sexual Misconduct for engaging in oral/anal sex without consent under New York Penal Law Section 130.20(2). (*Id.*) Plaintiff was later arraigned again on a superseding charging instrument reflecting that sex trafficking charges were dropped. (*Id.* at 5-6).

On November 19, 2004, Plaintiff pled guilty to the highest count and was convicted of Rape in the First Degree. (*See* Declaration of Tyrell Averhart ("Averhart Decl.") (ECF No. 35) ¶ 5; Declaration of Lindsy Osouna ("Osouna Decl.") (ECF No. 38) ¶ 5.) The other charges were dropped. Subsequently, on January 20, 2005, Plaintiff was sentenced to a 12-year term of incarceration and 5-year term of post release supervision. (Averhart Repository at 6-7.)

II. **Plaintiff's Incarceration and Conditions of Release**

After his conviction, Plaintiff was incarcerated until approximately December 2017. During those thirteen years, Plaintiff came to understand that he struggled with substance abuse and addiction, related mental health struggles, and maladaptive tendencies concerning aggression, and sought treatment for those issues. (Averhart Decl. ¶ 8.) Perhaps in connection with these struggles, in 2009, Plaintiff was convicted of knowingly making or possessing dangerous

3

contraband in prison in the first degree pursuant to New York Penal Law Section 205.25(2). (Averhart Repository at 3.)  The contraband in question was a razor blade.  (Averhart Decl. ¶ 9.)

On November 11, 2017, prior to Plaintiff's release from incarceration, Judge Matthew A. Sciarrino, Jr., Kings County Supreme Court (Criminal Term), made a final determination to designate Plaintiff a Sexually Violent Offender.  (Hermann Declaration Ex. C ("Offender Designation") (ECF No. 33-3).)  In connection with this Sexual Assault Reform Act ("SARA") adjudication and parole administration, a special parole condition was installed that restricted Plaintiff from having any contact with persons under the age of 18 without the permission of his parole officer, and Plaintiff was also restricted from residing within 1,000 feet of a school. (Osouna Decl. ¶ 6; Averhart Decl. ¶ 11.)  At this time, Plaintiff was not the parent to any minor, so the condition did not trigger any of the Department of Corrections and Community Supervision ("DOCCS") protocols for determining whether to restrict parolees from contact with their own children.  Plaintiff was also subject to other parole conditions, including conditions restricting him from using or possessing controlled substances without proper medical authorization.

III.    **Plaintiff's Release from Prison, Substance Abuse, Rehabilitation, and Repeated Arrests**

On December 13, 2017, Plaintiff was released from DOCCS custody to parole supervision. He moved in with his mother, Beverly Watson ("Watson") and several other family members, at her residence in or around Jamaica, Queens.  (*See* Declaration of Beverly Watson ("Watson Decl.") (ECF No. 34) ¶¶ 4 & 6.)  Over the course of the first six months, Plaintiff was able to make positive strides towards his post-incarceration integration into society including by socializing with his family, gaining work experience or work training, and attending to his substance abuse treatment. (Averhart Decl. ¶¶ 14.)  However, despite the outward appearance of his rehabilitation, Plaintiff

was privately abusing substances once again and considered himself a "functioning addict." (*Id.* ¶ 15.)

In or around June 16, 2018 Plaintiff admitted to parole officer Lindsy Osouna ("Officer Osouna") that he had used cocaine, oxycodone, and marijuana, and also tested positive for marijuana on June 27, 2018. (Osouna Decl. ¶7.) Plaintiff's use of illicit substances constituted a violation of certain parole conditions. Nonetheless, Plaintiff demonstrated a desire to rehabilitate by agreeing to enroll in a 28-day in-patient drug treatment program[1] at Cornerstone Medical Arts, and DOCCS decided not to seek revocation of Plaintiff's parole or additional incarceration for Plaintiff's parole violation. (Osouna Decl. ¶ 8; Averhart Decl. ¶ 16.)

After Plaintiff completed the 28-day rehabilitation program in or around July 2018, he obtained employment with Project Renewal cooking in the kitchen of a homeless shelter in Manhattan. By Plaintiff's account, the summer of 2018 was one of the happier times in his adult life because he was out of jail, gainfully employed, contributing money towards paying his family's expenses, and in a romantic relationship with an adult woman named Jazmine McKenzie. (Averhart Decl. ¶17-22.)

Notwithstanding the relative successes that Plaintiff achieved in integrating himself into post-incarcerated life, he soon faced more than one stumbling block. *First*, his position with Project Renewal was terminated after approximately four months because he repeatedly missed work due to illness and parole restrictions preventing him from attending work during Halloween in order to remain compliant with his no-contact condition. (Averhart Decl. ¶ 24.) *Second*, acrimony developed between Plaintiff and his older sister, Syderia, as Plaintiff notes that "after

---

[1] Defendants characterize Plaintiff's treatment as being performed in an outpatient capacity. (Osuna Decl. ¶ 8.) The distinction is immaterial for the purposes of the Court's analysis.

[he] lost [his] job, Syderia scolded [him] frequently" and "made clear her disapproval of [his] living at home without looking for a job" and that he subsequently moved out of the house and turned his attention towards living with Jazmine.  (Averhart Decl. ¶ 26.)  Defendants assert Plaintiff engaged in a fight with his sister, was kicked out of his familial residence, and moved into a men's shelter.  (Osouna Decl. ¶ 9.)  *Third*, after moving out and being informed by Jazmine that she was pregnant, Plaintiff suffered a relapse, began to abuse alcohol and drugs, failed to report to the Division of Parole, and tested positive for cocaine and marijuana.  (Averhart Decl. ¶ 29; Osouna Decl. ¶ 10.)

As a result of Plaintiff's violations of his conditions of release, a warrant was issued to Plaintiff for a parole violation, he was arrested, and incarcerated at Rikers Island pending his parole hearing.  (Averhart Decl. ¶ 29; Osouna Decl. ¶ 10.)  On April 10, 2019, a final revocation hearing was held, his revocation was upheld, and his sentence was deemed time served with restoration to parole supervision.  (*Id.*)

After his release from Rikers Island, Plaintiff suffered another unfortunate relapse which Plaintiff attributes to Officer Osouna's mismanagement of his medication assisted treatment ("MAT") and which Defendants attribute to Plaintiff's failure to attend treatment programs as directed by Officer Osouna.  More specifically, Plaintiff contends that he was enrolled in a methadone treatment program while he was incarcerated at Rikers Island, he responded well to the treatment, and he was released into a methadone treatment program at his final revocation hearing.  (Averhart Decl. ¶ 30.)  After Plaintiff's release from Rikers Island in April 2019, and despite positive development in the treatment of his abuse disorder through MAT, he was instructed by Officer Osouna to drop out of the program and instead enroll in a different treatment program that did not employ MAT, apparently based on her prejudice against the use of MAT.  (Averhart Decl.

¶ 32.)  Defendants note that "Plaintiff was sent to a treatment center for substance abuse treatment and anger management" but "reportedly missed appointments with the treatment center" which constituted a "violation of the special parole condition" that Plaintiff "participate in substance abuse treatment program as directed by the parole officer."  (Osouna Decl. ¶ 11.)

In any event, Plaintiff returned to abusing substances after he was denied access to MAT and failed to attend the treatment center.  Less than one month after he was released from Rikers Island, a parole warrant was issued on May 9, 2019 and, on May 20, 2019, Plaintiff tested positive for alcohol, cocaine, methadone, and synthetic cannabinoids-K2.  (Osouna Decl. ¶ 11.)  The Court notes that several of these substances—*i.e.*, alcohol, cocaine, and K2—are not opioids that bind to opioid receptors in the brain and are not approved for opioid replacement therapy in the treatment of opioid use disorder.  Separately, Plaintiff further violated conditions of his release through non-compliance with curfew, accessing social media, possessing an unauthorized phone, and missing treatment sessions.  (Hermannn Declaration Ex. B ("2019 Violation Papers") (ECF No. 33-2) at 8.)  As a result of Plaintiff's violation of these conditions, Plaintiff was incarcerated in May 2019, pleaded guilty to the violation, and was released back to the community in July 26, 2019 after a final revocation hearing in which Plaintiff was restored to parole supervision.  (Osouna Decl. ¶ 11; Averhart Decl. ¶ 34.)

On August 26, 2019—roughly one-month after his release from incarceration, and roughly three-days after his daughter J.C. was born (discussed in further detail below)—Plaintiff suffered another relapse, tested positive for oxycodone and methadone (neither were prescribed by a doctor to Plaintiff), and agreed to enroll in an in-patient treatment program at the direction of parole.  (Averhart Decl. ¶ 40; Osouna Decl. ¶ 14.)  Separately, on August 22, 2019, a drug test from an indeterminate earlier date tested positive for cocaine.  (Osouna Decl. ¶ 12.)  Defendants further

contend, though Plaintiff disputes, that Plaintiff was "physically and emotionally abusive towards Jazmine McKenzie." (Osouna Decl. ¶ 13.)

Shortly after Plaintiff's admission to in-patient treatment at Cornerstone, Plaintiff continued his descent into the throes of substance abuse. In, or around, August 28, 2019, Plaintiff "was caught smoking synthetic marijuana in the bathroom with other patients" and "left the program hours later without notifying parole." (Averhart Decl. ¶ 41.) The following day, Plaintiff failed to report to the Division of Parole as required under his parole condition and an absconder warrant was issued. (Osouna Decl. ¶ 14.)

On September 23, 2019, a final revocation hearing was held for Plaintiff's parole violation—which constituted the third such hearing since April 2019—and the Administrative Law Judge revoked Plaintiff's parole and sentenced him to either 12 months in jail or, alternatively, to a 90-day drug treatment program. (Osouna Decl. ¶ 15; Averhart Decl. ¶ 42.) Though Plaintiff omits this detail in his affidavit, Defendants contend that, initially, Plaintiff opted for the 90-day drug treatment program at Willard Drug Treatment Facility, but that, in December of 2019 "he was removed from the facility after he was issued a misbehavior report for [unspecified] misconduct" and was "thereafter sent to a New York State correctional facility to complete his 12-month parole violation sentence." (Osouna Decl. ¶ 16.) Plaintiff completed his 12-month parole revocation sentence at the Orleans Correctional Facility before being transferred to Fishkill RTF sometime in or around September 2020, and remains incarcerated at Fishkill RTF to this day.

## IV.      Plaintiff's Impending Fatherhood and Parole Interference

As mentioned above, in or around January 2019, Plaintiff was informed that Jazmine was pregnant with his child. Contemporaneous with his repeated parole violations described above, Plaintiff kept parole apprised of his impending fatherhood and was repeatedly informed that he

was not permitted to reside with his daughter, J.C., pursuant to the parole condition barring contact with minors.

First, in or around April 10, 2019, when Plaintiff was released from custody after his first parole revocation hearing, Plaintiff informed Officer Osouna that "Jazmine was pregnant, and that [he] intended to marry her." (Averhart Decl. ¶ 31.) Subsequently, Officer Osouna advised Plaintiff that "marriage was not a good idea" and that "she intended to enforce the condition [of release] to prevent [him] from ever seeing [his] child." (Averhart Decl. ¶ 31.) Later, in May 2019, after Plaintiff experienced a relapse, Officer Osouna and Officer Neely "scolded [Plaintiff] for getting Jazmine pregnant" and Officer Osouna advised Plaintiff that she would "make sure [Plaintiff would] never be around [his] child." (Averhart Decl. ¶ 33.) At no time during this interaction did Officer Osouna, or any other relevant parties, furnish Plaintiff with notice of how he might gain contact to his as yet unborn daughter.

The record is somewhat undeveloped as to what occurred between this meeting in May 2019, and the birth of J.C. on August 23, 2019 including with respect to what, if any, information was provided to Plaintiff and what, if any, investigation was undertaken by Defendants with respect to whether to restrict Plaintiff's parental rights on the basis of any dangers he might pose to J.C. During a hearing held on March 25, 2021, Defendants conceded that the first investigation into whether Plaintiff posed any threat to J.C. occurred in February 2021 and not before the J.C.'s birth on August 23, 2019. Likewise, Defendants conceded that DOCCS is obligated to provide written notice to that parolee that they have the opportunity to seek parental rights with respect to their children where DOCCS seeks to implement any restrictions. Defendants could not represent whether they had provided Plaintiff with any notice of his right to challenge restrictions on his parental rights. There is a strong basis to conclude no such notice was provided prior to J.C.'s

birth considering that, as described below, the notice was later provided in or around September 2, 2020.

In any event, on August 22, 2019, after being informed that Jazmine had gone into labor, Plaintiff was denied entrance to the hospital as the hospital staff had been instructed by Defendants to restrict his access "for the safety of [his] child." (Averhart Decl. ¶ 36; Watson Decl. ¶ 12.) Subsequently, Jazmine suffered a mental health incident (in part) precipitated by Plaintiff's absence during the onset of her labor, and she was either released from the hospital and returned to a different hospital (Watson Decl. ¶ 13) or transferred to the psychiatric unit of the same hospital (Averhart Decl. ¶ 37). On August 23, 2019, Plaintiff was again denied entrance at the hospital reception area, J.C. was born, and Plaintiff was not able to sign her birth certificate. (Averhart Decl. ¶¶ 38-39; Watson Decl. ¶¶ 13-14.)

In the aftermath of J.C.'s birth, Jazmine was in the midst of a mental health episode that caused her to behave in an erratic manner. This was not an isolated incident as Watson, Plaintiff's mother, represents that it was her understanding that Jazmine had been receiving intravenous medication to treat an underlying psychological disorder during pregnancy. (Watson Decl. ¶ 15.) Faced with a trying situation where Plaintiff was prevented from seeing his daughter and Jazmine was in no condition to be a caregiver, Watson and Syderia (Plaintiff's sister) commendably agreed to a kinship care arrangement where they would be the caretakers for J.C. on, or around, August 27, 2019. (*Id.*)

Since that time, MercyFirst has acted as the foster care agency and custodian of J.C., and pursuant to a formalized arrangement, Syderia and Watson have been the primary and secondary foster caregivers, respectively. (*Id.*) Though Plaintiff initially struggled to say who was the legal custodian of J.C., it was established during the hearing that the foster care agency that supervises

J.C.'s care is Mercy First and that agency is supervised by the New York City Administration for Children's Services ("ACS") which appears to be the actual custodian of J.C.  Neither Plaintiff nor Jazmine are legal custodians of J.C., and Plaintiff's counsel stated during a hearing before this Court that a legal process (a Permanency Planning proceeding) is underway in New York State Family Court which may govern the ultimate disposition of J.C.'s continued caretaking.

On August 26, 2019—after J.C.'s birth, but before Plaintiff's immediate incarceration— Defendants—or an unspecified third party—initiated a neglect proceeding in New York state Family Court, and obtained a temporary order of protection requiring Plaintiff to stay away from J.C., the home of J.C., and J.C.'s childcare providers and babysitters through September 4, 2019. This temporary order was subsequently extended until September 17, 2019.  There is no further record provided to this Court of the Family Court proceedings.

## V.        Plaintiff's Current Incarceration and Attempts to Obtain Release

As mentioned above, after J.C.'s birth, Plaintiff tested positive for multiple substances, was admitted to an in-patient treatment facility, used illicit substances at the treatment facility, was sentenced to either further in-patient treatment or incarceration, and elected in-patient treatment before leaving that facility and serving the remainder of his 12-month sentence in a correctional facility.  During his incarceration, Plaintiff was initially in a drug treatment program but was removed from the program due to misconduct unrelated to substance abuse.  (Averhart Decl. ¶ 43.) Plaintiff also states that he has used this term of incarceration to engage in self-reflection, improvement, regularly speak to J.C. over the phone, and recount stories and nursery rhymes to J.C.  (*Id.* ¶ 45-47.)

Plaintiff's current incarceration expired on or around September 6, 2020.  (Declaration of Beverly Lockwood ("Lockwood Decl.") (ECF No. 40) ¶ 7.)  However, in light of his status as a sex offender, Plaintiff is required to obtain SARA-approved housing prior to being released.  When

he was initially released from his extended incarceration in 2017, this prerequisite was easily met as he was able to reside in his mother's home which was, and remains, SARA-approved.  But, as mentioned above, J.C. was now living in this residence, and Defendants had previously prevented Plaintiff from making any contact with J.C.

Plaintiff once again sought to be released to his mother's home.  (Averhart Decl. ¶ 49.)  To this end, on August 9, 2020, his attorneys contacted DOCCS and requested that DOCCS immediately lift any condition barring Plaintiff from contact with J.C.  (Hermann Declaration Exhibit E ("August Demand Letter") (ECF No. 33-5).)  In response to the letter, on August 10, 2020, Chief Parker, a bureau chief with the New York State Division of Parole, responded advising that DOCCS would only consider offering strict supervised visitation between Plaintiff and J.C. in light of Plaintiff's violations of parole in 2019.  (Hermann Declaration Exhibit F ("2020 DOCCS Emails") (ECF No. 33-6) at 2.)  Chief Parker further advised Plaintiff's counsel that no condition was yet imposed on Plaintiff as "the condition cannot be imposed until the subject is released and circumstance regarding visitation are known, i.e., who the child lives with [and] how will the visitation be supervised."  (*Id.*)  Plaintiff's counsel then observed to Chief Parker that, regardless of his formalistic understanding of when any condition was being imposed, they were effectively imposing a no-contact condition on his release by refusing to approve Plaintiff's mother's residence for Plaintiff's release.  (*Id.* at 1.)

Around that same time, on September 2, 2020, Plaintiff was provided with several forms indicating the conditions of Plaintiff's release from the Orleans Correctional Facility.  Numerous conditions are set forth to his release, none of which expressly states that he is restricted from living with or visiting J.C.  (Lockwood Declaration Exhibit A ("Release Form") (ECF No. 40-1).)  Indeed, it is telling that, instead of citing to a specific condition of release, Defendants point to

their provision of a pre-release notice to Plaintiff describing when a "condition of supervision limiting or prohibiting contact is contemplated or has been imposed" which does not seem to independently establish a condition limiting Plaintiff's contact with his daughter but instead directs Plaintiff to make a request for parental contact.  (Release Form at 14.)  Regardless, both parties affirmatively argue that a no-contact condition was in place during 2020 and neither side seems to put much stock in whether that condition was memorialized in documents not presented to this Court.

After receiving the form, Plaintiff did not submit any documents requesting parental contact conforming to the requirements established in the forms provided to Plaintiff on September 2, 2020.  (Lockwood Decl. ¶ 13.)  Plaintiff complains that his attorneys vigilantly sought the removal of any condition barring his contact with his daughter and that Defendants failed to advise them that any specific documentation was needed and instead asserted that any conditions barring contact between Plaintiff and his daughter was to be established after he was released.  (Pl's Reply at 8-9; 2020 DOCCS Emails at 2.)  Regardless, between September 6, 2020—the date Plaintiff's sentence of incarceration expired—and the present date, Plaintiff has been forced to reside at Fishkill RTF because DOCCS has not approved any proposed residence, including Plaintiff's mother's residence, and there is a shortage of SARA-approved residences and backlog of inmates awaiting their release.

After the instant action was initiated, Plaintiff submitted documents requested by Defendants in order to gain permission for contact with his child through Plaintiff's counsel to his Parole Officer and the Bureau Chief assigned to his case.  (Lockwood Decl. ¶ 14.)  Sometime after February 4, 2021, Supervising Parole Officer Alan Preston ("Officer Preston") reviewed Plaintiff's application.  (Declaration of Alan Preston ("Preston Decl.") (ECF No. 39) ¶ 11.)  By Officer

Preston's account, "DOCCS is not permitted to release Plaintiff to his daughter's residence at this time in contravention of the foster care agency's opposition to Plaintiff's unsupervised contact with J.C. and "the applicable statutes and regulations governing foster care." (*Id.* ¶ 13.)  Officer Preston does not cite any "applicable" statutes or regulations.  In any event, based upon his review of the application and "consideration of the information available to [him]" including, the purported prohibition on DOCCS permitting Plaintiff to live with J.C. and "Plaintiff's previous performance on parole" Officer Preston concluded that "DOCCS will permit Plaintiff to have supervised contact with his daughter upon his release to a SARA-compliant residence" and noted that Plaintiff would be permitted to reside at his mother's residence provided that his daughter was not there.  (*Id.* ¶ 14.)

In sum, the current state of affairs is as follows:  (1) Plaintiff is, understandably, seeking to expedite his release from the custody of New York State months after his term of incarceration has expired, and would prefer to live with J.C.; (2) Defendants are not presently imposing a no-contact condition, but are instead imposing a condition of supervised visitation after Plaintiff is released from custody to a SARA-approved residence; and (3) Defendants are not approving Plaintiff's release to his mother's home because his daughter resides in that home and such release would violate the supervised visitation condition and would go against the wishes of J.C.'s custodian foster care agency.

## PROCEDURAL HISTORY

On January 15, 2021, Plaintiff filed the present action pursuant to Section 1983, alleging violations of his substantive and procedural due process rights. (*See* Compl.)  Plaintiff moved for a preliminary injunction on January 20, 2021.  Initially, Plaintiff requested a preliminary injunction enjoining Defendants' enforcement of a no-contact order prohibiting Plaintiff from having any physical contact with his infant daughter J.C. (Notice of Motion.)  Subsequently, Defendants

responded and represented that they do not intend to enforce or enter any no-contact condition barring Plaintiff from physical contact with J.C., and instead only seek to enforce a supervised visitation condition.  (*See* Defs' Opp.)  Though less than clear, Plaintiff seems to assert in his reply papers that he seeks to enjoin Defendants from enforcing both the no-contact condition to the extent it may be reimposed and to enjoin Defendants from enforcing a supervised visitation condition.  (Pl's Reply.)  A remote hearing on the matter of the preliminary injunction attended by counsel for all parties was held before this Court on March 25, 2021.  This Opinion follows.

## **LEGAL STANDARD**

Injunctive relief is "an extraordinary remedy that may only be awarded upon a clear showing that the [movant] is entitled to such relief."  *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 22 (2008).   "A party seeking a preliminary injunction must demonstrate: (1) 'a likelihood of success on the merits or . . . sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the plaintiff's favor'; (2) a likelihood of 'irreparable injury in the absence of an injunction'; (3) that 'the balance of hardships tips in the plaintiff's favor'; and (4) that the 'public interest would not be disserved' by the issuance of an injunction."  *Benihana, Inc. v. Benihana of Tokyo, LLC*, 784 F.3d 887, 895 (2d Cir. 2015) (quoting *Salinger v. Colting*, 607 F.3d 68, 79-80 (2d Cir. 2010).

"A showing of irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction."  *Faively Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009); *see Singas Famous Pizza Brands Corp. v. N.Y. Adver. LLC*, 468 F. App'x 43, 45 (2d Cir. 2012). "To satisfy the irreparable harm requirement, Plaintiff[ ] must demonstrate that absent a preliminary injunction [it] will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm."  *Faively*, 559 F.3d at 118 (quoting *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d

60, 66 (2d Cir. 2007)). The "mere possibility of irreparable harm is insufficient to justify the drastic remedy of a preliminary injunction." *Borey v. Nat'l Union Fire Ins. Co.*, 934 F.2d 30, 34 (2d Cir. 1991).

With respect to the level of persuasion required to satisfy the first factor, courts have distinguished between motions seeking a prohibitory injunction as opposed to those seeking a mandatory injunction.   Where a party seeks a mandatory injunction "altering, rather than maintaining, the status quo," that party "must meet [a] more rigorous standard." *Almontaser v. N.Y. City Dep't of Educ.*, 519 F.3d 505, 508 (2d Cir. 2008) (internal alterations omitted); *see also Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 34 (2d Cir. 1995) ("[W]e have required the movant to meet a higher standard where . . . an injunction will alter, rather than maintain, the status quo."). The moving party must establish a "'clear' or 'substantial' likelihood of success," or show that "extreme or very serious damage" would result in the absence of injunctive relief.   *Tom Doherty Assocs., Inc.*, 60 F.3d at 34.   Where, as here, the requested injunction seeks to enjoin government enforcement of a regulation—*i.e.*, the enforcement of regulatory authority to restrict Plaintiff's association with family members—such an injunction is considered prohibitory rather than mandatory injunction.   *See, e.g.*, *Mastrovincenzo v. City of New York*, 435 F.3d 78, 90 (2d Cir. 2006) (holding injunction is prohibitory when it enjoins government enforcement of a regulation); *Marquez v. Annucci*, No. 20 CIV. 1974 (AKH), 2020 WL 3871362, at *5 (S.D.N.Y. July 9, 2020) (holding injunction seeking to enjoin government from creating or enforcing conditions of supervision that prevent or interfere with movants' relationship as a married couple is prohibitory in nature).   With respect to a mandatory injunction, to establish a likelihood of success on the merits, a plaintiff "need not show that success is certain, only that the probability of prevailing is 'better than fifty percent'." *BigStar Entm't, Inc. v. Next Big Star, Inc.*,

105 F. Supp. 2d 185, 191 (S.D.N.Y. 2000) (quoting *Abdul Wali v. Coughlin*, 754 F.2d 1015, 1025 (2d Cir. 1985), *overruled on other grounds*, O'Lone v. Estate of Shabazz, 482 U.S. 342, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987)).

## DISCUSSION

### I.  Mootness

As a threshold matter, Defendants argue that Plaintiff's motion is moot because "there is no special parole condition barring Plaintiff's contact with his daughter at this time" and that instead "DOCCS is allowing Plaintiff to have supervised visitation with his daughter upon his release to parole supervision." (Defs' Opp. at 6.)  In sum, Defendants argue that they are not seeking to completely bar contact between Plaintiff and J.C. at this time and accordingly they have voluntarily ceased engaging in the challenged practice.  (*Id.* at 6-8.)  Plaintiff responds that Defendants' mootness argument fails because Defendants have failed to show (1) that the interim relief has irrevocably eradicated the effects of the alleged violation (Pl's Reply at 3-5) or (2) that there is no reasonable expectation that the alleged violation will recur (Pl's Reply at 5-7).  The Court agrees with Plaintiff.

*First*, in order to completely and irrevocably eradicate the effects of a challenged practice, Defendants must as a threshold matter remedy the alleged violations.  *Feltenstein v. City of New Rochelle*, 254 F. Supp. 3d 647, 656 n.7 (S.D.N.Y. 2017).  However, the alleged violation in the instant matter is Defendants' interference with Plaintiff's right to familial association without justification.  As discussed in further detail below, the Court finds that, whether the restriction is a complete no-contact condition or the lesser restriction of supervised visitation, the record presented to this Court indicates that Defendants did not perform the sort of particularized assessment demanded by clear precedent in the Second Circuit to justify restricting Plaintiff's familial association through the imposition of a post-release parole condition.

*Second*, even if it could be said that the imposition of supervised visitation was appropriate under the law, the fact remains that this change in parole conditions is not sufficiently permanent to moot the issue.  In other words, a risk that the violation will recur is still present.  Defendants characterize their current relaxing of conditions of Plaintiff's release in an ephemeral present tense – *i.e.*, on several occasions Defendants state that they are not seeking to bar Plaintiff's contact with J.C. "at this time." (Defs' Opp. at 1, 6, and 10).   More importantly, Defendants assert that Plaintiff's ability to have supervised visitation with J.C. is "subject to Plaintiff's performance on parole."  (Preston Decl. ¶ 14.)  It is notable that Defendants do not state that Plaintiff's contact with his daughter is subject to Plaintiff's *compliance with conditions of his release*—which would be understandable as, to the extent that Plaintiff violated parole conditions and were subjected to further incarceration, he necessarily would not cohabitate with his daughter—but instead state that his contact with J.C. is subject to the vague concept of Plaintiff's "performance on parole."  The latter condition ultimately leaves Plaintiff's continued contact with his daughter subject to the arbitrary determinations of Defendants such that it cannot be said with assurance that there is no reasonable expectation that constitutional violations will recur, and thus Plaintiff's motion for preliminary injunction is not rendered moot.  *See, e.g.*, *Ciaramella v. Zucker*, No. 18-CV-6945 (JPO), 2019 WL 4805553, at *6 (S.D.N.Y. Sept. 30, 2019) (finding claims were not mooted where Plaintiff failed to make "an unequivocal commitment that it does not intend to reinstate [an allegedly unconstitutional policy]."); *NRDC v. United States Department of Energy*, 362 F. Supp. 3d 126, 138 (S.D.N.Y. 2019) (finding claims were not mooted where defendants had not categorically stated that it would not revert to the challenged policy).  Moreover, Defendants' failure in August 2019 to provide Plaintiff with any notice, much less adequate written notice, of his right to request parental contact and attendant investigation (*see* Hermann Decl. Exhibit D

("DOCCS Parental Protocol") (ECF No. 33-4) at 2) powerfully illustrates the dangers of continuing to rely on the largesse or competence of Defendants to avoid violating Plaintiff's constitutional rights.

## II.      Irreparable Harm

"A showing of irreparable harm is essential to the issuance of a preliminary injunction." *Shapiro v. Cadman Towers, Inc.*, 51 F.3d 328, 332 (2d Cir.1995).  In order to demonstrate that it will suffer irreparable harm, a party seeking preliminary injunctive relief "must demonstrate that absent a preliminary injunction [it] will suffer 'an injury that is neither remote nor speculative, but actual and imminent,' and one that cannot be remedied 'if a court waits until the end of trial to resolve the harm.'" *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir.2007) (quoting *Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 114 (2d Cir.2005)). "[T]he moving party must demonstrate that such injury is likely before the other requirements for the issuance of an injunction will be considered."  *Freedom Holdings*, 408 F.3d at 114.

It is well established that the alleged violation of (certain) constitutional rights, for even minimal periods of time, constitutes an irreparable injury.  *Elrod v. Burns*, 427 U.S. 347, 373, 96 S. Ct. 2673, 2690, 49 L. Ed. 2d 547 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.")  Likewise, the Second Circuit has recently affirmed grants of preliminary injunctions where irreparable harm was based upon movant alleging First and Fourteenth Amendment violations and that, without injunctive relief, movants could not compete nor participate in New York's Democratic presidential primary. *Yang v. Kosinski*, 960 F.3d 119, 128 (2d Cir. 2020).  The Second Circuit has recognized that "the alleged violation of a constitutional right triggers a finding of irreparable injury" on other occasions and constitutional contexts as well.  *Connecticut Dep't of Env't Prot. v. O.S.H.A.*, 356 F.3d 226, 231 (2d Cir. 2004) (citing *Jolly v. Coughlin*, 76 F.3d 468, 482 (2d Cir.1996); *see also*

11 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice & Procedure, § 2948.1 (3d ed.) ("When an alleged deprivation of a constitutional right is involved, such as the right to free speech or freedom of religion, most courts hold that no further showing of irreparable injury is necessary.")).  At least one district court has previously found that the allegation of a Fourteenth Amendment violation arising from a probation condition barring movant from contact with his daughter was sufficient to constitute irreparable harm. *See Doe v. Smith*, No. 5:06 CV 121FJS/DEP, 2006 WL 383514, at *2 (N.D.N.Y. Feb. 16, 2006) (finding irreparable harm based on allegation "that Defendants have violated their right to privacy under the Fourteenth Amendment to the United States Constitution and Plaintiff John Doe's right to exercise his religion under the First Amendment to the United States Constitution.).

Here, Plaintiff has asserted a constitutional violation – *i.e.*, that his substantive due process rights are being violated as a result of the imposition of either a no-contact or supervised visitation condition to his parole.  It is black-letter law that the allegation of such a violation triggers a finding of irreparable injury.  Defendants did not address this line of cases and instead seem to argue the merits of Plaintiff's due process claim.  (*See* Defs' Opp. at 9 (arguing, *inter alia*, that Plaintiff's substantive due process claim is deficient insofar as Plaintiff's own criminal conduct was the intervening cause of his separation from his daughter).)  In any event, the Court concludes that the alleged constitutional violation asserted by Plaintiff is sufficient to establish irreparable harm as a matter of law.

## III.     Likelihood of Success

As mentioned above, the movant must show "some likelihood" of success on the merits given that he seeks a prohibitory rather than mandatory injunction.  In order to assess the viability of Plaintiff's substantive due process claim, the Court first examines whether Plaintiff has a fundamental liberty interest in the care, custody, and management of his child despite his status as

a noncustodial unwed father whose paternity is still subject to Family Court proceedings.  Second, the Court examines whether the imposition of either a no-contact condition of release or supervised visitation condition survives strict scrutiny.  Third, the Court examines whether Plaintiff's claim is unlikely to succeed insofar as the relief it seeks is exclusively available through habeas corpus and is not viable as a Section 1983 claim.  Though this is a far closer call than either party is willing to concede, the Court ultimately finds that there has been a sufficient showing of "some likelihood" that Plaintiff will succeed on his claims, but only to the extent his claims is viable under Section 1983 claim and do not seek to invalidate or affect the duration of his confinement.

       *A.*     *Existence of a Liberty Interest*

"It is well established that a parent's interest in maintaining a relationship with his or her child is protected by the Due Process Clause of the Fourteenth Amendment."  *United States v. Myers*, 426 F.3d 117, 125 (2d Cir. 2005) (emphasis added) (citing *Wilkinson v. Russell*, 182 F.3d 89, 103-04 (2d Cir. 1999)); *see also United States v. McGeoch*, 546 F. App'x 44, 48 (2d Cir. 2013) (summary order) ("A condition of supervised release that prevents a father from seeing his children outside the presence of an approved monitor is a severe one subject to careful scrutiny."). Nonetheless, the degree of "protection varies in accordance with the nature of the parent-child bond." *Yunus v. Robinson*, 17-CV-5839, 2018 WL 3455408, at *34 (S.D.N.Y. June 29, 2018); *see also Meyers*, 426 F.3d at 128 (remanding for fact-finding where the supervised releasee had never been the child's custodian and presented "no evidence" in support of his claim that he played "an active role in the life of his son" before he was incarcerated); *Doe v. Lima*, 270 F. Supp. 3d 684, 701-03 (S.D.N.Y. 2017) (applying strict scrutiny where state police officers expelled sex offender parolee from his marital home after his wife gave birth to a son, without conducting any individualized inquiry into whether parolee was a danger to the infant).

In situations not dissimilar from the instant case (but in a different procedural posture), where the father's legal rights and relationship with his child are somewhat compromised, the Second Circuit has been hesitant to set forth bright line rules as to what facts give rise to an inference that an unwed father has a defined liberty interest in associating with his child.  For example, in *United States v. Donahue*, the Second Circuit found that the district court, in its capacity sentencing the defendant to supervised release conditions barring contact with his child, did not have a sufficient record to determine whether defendant's relationship with his son was sufficiently established to merit constitutional protection.  726 F. App'x 3 (2d Cir. 2018).  In that case, defendant maintained that "he had a relationship with his son while incarcerated and wishes to continue such a relationship" whereas the government alleged that defendant's son lived out of state and that defendant had no role in his upbringing and that he has not officially established his paternity."  *Id.* at 7.  In *United States v. Myers*, the Second Circuit noted that where a party fails to "establish a legally cognizable interest as a parent of a child in foster care born out of wedlock" it follows that the court "cannot determine whether [a no-contact supervised release condition] is appropriately tailored to satisfy the goals of sentencing."  426 F.3d at 129.  Accordingly, further fact finding was required on remand as to whether the supervisee had demonstrated a "full commitment to the responsibilities of parenthood by coming forward to participate in the rearing of his child", and the Second Circuit noted that, among relevant factors to this inquiry would be the "ultimate resolution of [supervisee's] attempts to gain visitation rights."  *Id.* at 129.

To be sure, federal courts have not meaningfully established the contours of what constitutes a demonstration of full commitment to the responsibilities of parenthood.  This dearth of relevant guidance is likely attributable to "domestic relations law [being] almost exclusively the province of the states."  *Brissett v. Ashcroft*, 363 F.3d 130, 133 (2d Cir. 2004).  New York courts

and its legislature, by contrast, have attempted to flesh out what factors give rise to a showing that the unwed father has engaged in a full commitment to the responsibilities of parenthood.  In the context of judicial proceedings where an unwed non-custodial biological father seeks to object to the adoption of his child, the New York Court of Appeals has considered the following factors: (1) "a prompt assertion of an interest in assuming custody"; (2) "public acknowledgment of paternity," (3) "payment of pregnancy and birth expenses," (4) "steps taken to establish legal responsibility for the child," and (5) "other factors evincing a commitment to the child."  *Raymond AA v. Doe*, 217 A.D.2d 757, 760 (3d Dep't 1995) (citing *Matter of Raquel Marie X.*, 76 N.Y.2d 387, 408 (1990)).

As applied here, Plaintiff has taken certain meaningful steps to evince a commitment to parenthood.  For example, during the pregnancy, Plaintiff asserts that he assumed significant responsibilities to ensure the health of J.C. and to obtain material necessities, as he "made sure Jazmine was well-cared for by taking her to her doctor's appointments and making sure she was taking her medication for her pregnancy and her mental illness" and went to "the New York City Department of Homeless Services office every day, and [] shopped [] at the Salvation Army for baby clothes."  (Averhart Decl. ¶ 28.)  Plaintiff also consistently held out J.C. as his daughter including by announcing to his parole officers on several occasions that he intended to marry Jazmine and raise J.C.  (Averhart Decl. ¶¶ 31 & 33.)  Plaintiff has also taken steps to establish legal responsibility for his child by: (1) attempting to attend the birth of J.C.—during which time he could have obtained legal responsibility over his daughter had he signed his daughter's birth certificate—and (2) participating in pending family court litigation regarding the disposition of custody over J.C.  Finally, Plaintiff evinced a commitment to J.C.'s childrearing and wellbeing by

calling her on a daily basis from jail to speak, read, and sing to her.  (Averhart Decl. ¶¶ 35-39, 45-46, & 48-49.)

There are certainly countervailing facts that the Family Court might consider in the context of a permanency hearing or removal hearing that would weigh against the recognition of Plaintiff's asserted liberty right.  By Plaintiff's own admission, not long after he learned about Jazmine's pregnancy, he was accused of using money that he "had promised to spend on caring for Jazmine [during her pregnancy] . . . for drugs."  (Averhart Decl. ¶ 33.)  Indeed, Plaintiff's persistent drug use, inability to maintain consistent work, and apparent diversion of funds intended for Jazmine's pregnancy related expenses towards drug use suggests that Plaintiff's aspiration to fatherhood is not accompanied by a full commitment to the burdens and obligations of caretaking and fatherhood.  *See Raymond AA*, 217 A.D.2d at, 761 (affirming Family Court's conclusion that petitioner chose not to engage in any conduct indicative of a manifestation of parental responsibility where he "purchased nothing for the respondent or the baby", "spent more money on drugs and alcohol then he received in public assistance", and was "consistently unemployed.") This Court is not in possession of the record before the Family Court that entered two temporary orders of protection barring Plaintiff from physical contact with J.C. in 2019, but it is certainly conceivable that they restricted his contact with J.C. based on his drug use in or around the time of J.C.'s birth.  Relatedly, Plaintiff did not petition to have parental rights restored during the period after J.C.'s birth but prior to his incarceration (when the orders of protection were entered) and the record is unclear as to how Plaintiff is now seeking the restoration of his parental rights other than that some family court proceeding—perhaps a permanency hearing—is ongoing.  This certainly cuts against the argument that Plaintiff promptly engaged in efforts to establish legal responsibility for his child.

Based upon the aforementioned factors, and if only by the slimmest of margins, there is "some likelihood" that Plaintiff can establish a liberty interest in his familial association with J.C. The majority of facts weighing against Plaintiff's commitment to fatherhood occurred over one year ago—*e.g.*, his diversion of funds intended for pregnancy costs to use drugs and his failure to immediately seek restoration of his paternity rights—whereas more recent conduct weighs in his favor—*e.g.*, participating in state court litigation to obtain custodial rights and his daily calls to J.C. It bears emphasizing here that this Court reaches this conclusion based on a somewhat limited factual record—*e.g.*, the parties struggled to even identify for the Court who the legal custodian of J.C. was at the time of the preliminary injunction hearing—and in a procedural posture where Plaintiff bears a less burdensome standard of proof. A Family Court with a more fulsome record and aided by the participation of J.C.'s legal custodians may reach an entirely different conclusion as to whether Plaintiff has a liberty interest in familial association with J.C. should similar legal issues be presented. This Opinion should not be read to foreclose that contrary outcome or guide the reasoning of the Family Court.

      B.      *Whether Conditions are Narrowly Tailored*

Having reached the conclusion that Plaintiff has a fundamental liberty interest in the care, custody, and control of his daughter, it follows that Defendants' "[r]estrictions on such protected liberty interests are subject to strict scrutiny." *Doe v. Lima*, 270 F. Supp. 3d 684, 702 (S.D.N.Y. 2017), *aff'd sub nom. Doe v. Cappiello*, 758 F. App'x 181 (2d Cir. 2019). As is relevant here, "[t]he Second Circuit has applied strict scrutiny to restrictions on liberty incident to post-prison supervisory regimes, whether denominated as parole (as in New York State) or as supervised release (as in the federal system)." *Id.* In order to satisfy strict scrutiny, the imposition of a condition of parole or supervised release restricting familial association must be accompanied by an individualized inquiry into whether the risk factors associated with the parolee or supervisee

pose a threat to the child.  *See, e.g.*, *McGeoch*, 546 F. App'x at 49 ("Absent an individualized inquiry into whether McGeoch's sexual proclivities pose a threat to his sons, however, the imposition of a harsh condition of supervised release that either prohibits interaction with his children or makes such interaction subject to supervision by a person approved of by the probation officer violates McGeoch's due process rights.")

This individualized inquiry is not satisfied where state parole officers either wholesale failed to conduct an investigation, merely enforce a condition preventing familial association based on the nature of the crime committed, or where the purported bases for restricting familial association derived from an investigation are not sufficiently related to the safety of the child. *Lima*, 270 F. Supp. 3d at 704-707.  For example, evidence that a parolee had been convicted of rape involving manipulation of a minor in a family setting, statements by parolee denying his guilt, and the objection of parolee's victim did not permit an inference that the parolee was a danger to his infant son (who was not the victim of parolee's crime).  *Id.*; *see also Doe v. Smith*, No. 5:06 CV 121FJS/DEP, 2006 WL 383514, at *3 (N.D.N.Y. Feb. 16, 2006) (finding insufficient evidence to indicate that there is a rational basis for the to ban contact between parolee and his child where there was, among other things, "nothing in the record to indicate that any of his arrests or convictions for sexual misconduct or endangering the welfare of a child involved a child who was even close to the age of his infant daughter, who is eleven-months old.")

Here, the imposition of either supervised visitation or no-contact does not appear to be justified based on the results of any individualized inquiry.  Plaintiff's claims are predicated upon two restrictions in place during different time periods: (1) a no-contact condition that was enforced around the time of J.C.'s birth, *i.e.*, August 23, 2019, and (2) a proposed condition of supervised visitation that would be enforced prospectively after Plaintiff is released, and is already being

enforced to the extent it is the sole basis for denying Plaintiff release from Fishkill RTF. The Court analyzes these restrictions separately.

### 1. *Adequacy of Tailoring of The No-Contact Condition*

The first restriction was put into place prior to the birth of J.C., enforced through the use of security guards at various hospitals preventing Plaintiff entry to the maternity department, remained unsupported by any individualized investigation, and was not preceded by any notice to Plaintiff regarding his right to seek familial association in conformity with DOCCS internal policies. On the current record, there is little question that preventing Plaintiff from attending J.C.'s birth, or associating with her in the immediate aftermath of her birth, violated his substantive due process rights because no investigation was conducted and no particularized basis was then present warranting the imposition of a no-contact rule.

Nonetheless, this Court is only inclined to find "some likelihood" that Plaintiff's substantive due process rights were violated between August 23, 2019—the date of J.C.'s birth—and August 26, 2019—the date the Family Court entered an Order of Protection restraining Plaintiff from contact with J.C. Plaintiff's counsel conceded during oral argument that, to the extent a Family Court order barred Plaintiff's contact with his daughter, this Court would not have subject matter jurisdiction to overturn such a State Court judgment, and seeking to impose liability against DOCCS would be a fairly obvious appeal of the Family Court Orders of Protection which were in effect between August 26, 2019 and September 17, 2019. It is unclear whether Plaintiff is attempting to assert a claim that his substantive due process rights were violated between August 29, 2019—when he was detained pursuant to an absconder warrant—and September 6, 2020— when his current term of incarceration expired. It would appear that Plaintiff's own criminal conduct—which resulted in his admissions to in-patient rehabilitation facilities and then a correctional facility—was an intervening cause of his inability to associate with J.C. during this

time, and accordingly Plaintiff has not met its burden of demonstrating "some likelihood" that such a claim would prevail.

2.     *Adequacy of Tailoring of Supervised Visitation Condition*

The Court also concludes that there is "some likelihood" that Plaintiff will prevail on his claim that the imposition of a supervised visitation condition after September 6, 2020 violated his substantive due process rights.  This is admittedly a closer call based upon all of the concerns this Court has considered with respect to Plaintiff's ongoing battles against substance abuse disorder and sexual dysfunction.  Nonetheless, a parole condition "that prevents a father from seeing his children outside the presence of an approved monitor is a severe one subject to careful scrutiny," and accordingly may only stand to the extent an individualized investigation results in finding of a particularized threat the parolee poses to his child.  *McGeoch*, 546 F. App'x at 48.

Here, the record does not demonstrate that a diligent individualized investigation was conducted in advance of DOCCS' determination to require supervised visitation nor have Defendants articulated a particularized threat that Plaintiff poses to his daughter.  Instead, the investigation consisted of "reviewing Plaintiff's most updated file [*n.b.*, the contents of the 'file' are unspecified in the record] and his application requesting parental contact", and "speaking to personnel from the foster care agency supervising Plaintiff's daughter who indicated that Plaintiff and his daughter are not allowed to live together in the foster home because as the biological parent, Plaintiff is not permitted by the [unspecified] statute to live with his child due to the child being in foster care."  (Osouna Decl. ¶¶ 21-22; *see also* Preston Decl. ¶¶ 10-14.)  Defendants do not state what information they consulted in conducting their investigation other than that they reviewed Plaintiff's "application" and his "updated file"—the contents of which remain a mystery—nor do they explain what in the investigation lead them to conclude that supervised visitation was necessary.  The investigation, which only began after Plaintiff filed his moving

papers, did not follow numerous of the steps recommended in the Parental Contact Protocol directive issued by DOCCS including, among other things, that: (1) Defendants' counsel represented during the hearing that to her knowledge the parental contact determination was not documented anywhere; (2) Defendants did not appear to consult J.C.'s family members in reaching their decision; (3) Defendants did not appear to analyze his sexual offender treatment progress or the results of his sex offender polygraph tests; (4) Defendants did not appear to analyze Plaintiff's current (albeit limited) remote contact with J.C. during his incarceration; and (5) Defendants do not account for how they considered the characteristics of Plaintiff's prior victim relative to J.C. (*See* Osouna Decl. ¶¶ 20-21; DOCCS Parental Protocol at 3-4.)

At best, Officers Osouna and Preston point to two considerations that guided their determination: (1) Plaintiff's "poor performance on parole" (Osouna Decl. ¶ 20; Preston Decl. ¶ 14); and (2) the assertion by both ACS and the foster care agency supervising J.C. that they "will not permit her to remain in the same home in which Plaintiff resides" (Preston Decl. ¶ 12; *see also* Osouna Decl. ¶ 21).   With respect to the former basis for instituting supervised visitation, Defendants vaguely point to Plaintiff's prior parole violations without specifying how they endanger J.C.  This Court need not feign naivete, his past parole violations were largely related to substance abuse and the suggestion is that Plaintiff is a danger to J.C. to the extent he is left with her unsupervised during a relapse.  This concern is not without reason.  Nonetheless, Defendants are essentially asking this Court to draw several attenuated inferences that are not persuasively supported on the current factual record in order to conclude that Plaintiff is a danger to J.C: *first*, the Court must infer that Plaintiff is likely to abuse drugs after his release from Fishkill RTF; *second*, the Court must infer that Plaintiff will abuse drugs in the presence of J.C.; *third*, the Court must further conclude that during an episode of drug abuse in the presence of J.C., Plaintiff will

abuse or neglect J.C.  This Court is not in a position to conclude that there is a likelihood of this risk because nothing in the current record speaks to whether Plaintiff: (1) is presently at a heightened risk of abusing drugs after spending over one-year incarcerated and presumably abstaining from substance abuse; (2) has a history of abusing drugs in the presence of family members, or (3) has engaged in violent or dangerous activities towards others when abusing drugs. Without the consideration of such evidence, Defendants' asserted basis for supervised visitation is plainly insufficient.  *See, e.g.*, *Tremper v. Ulster Cty. Dep't of Prob.*, 160 F. Supp. 2d 352, 358 (N.D.N.Y. 2001).

   C. *Availability of Injunctive Relief Seeking Release from Prison*

  Notwithstanding the foregoing, Defendants raise a separate argument that Plaintiff's claim is unlikely to succeed because it impermissibly seeks his immediate release from incarceration and, accordingly, the only appropriate vehicle for his claim is a writ of habeas corpus.   (Defs' Opp. at 13-14.)  Plaintiff clarified in his reply papers that he is not seeking any relief in the form of release from custody, and merely seeks prospective relief from a condition of release that would disrupt his association with J.C.  (Pl's Reply at 5n.2.)  Defendants are undoubtedly correct that, to the extent Plaintiff was seeking to enjoin them from detaining him then he would be contesting the validity of Plaintiff's confinement and, accordingly, only habeas relief would be appropriate.  *See, e.g.*, *Wilkinson v. Dotson*, 544 U.S. 74, 81 (2005); *Jenkins v. Haubert*, 179 F.3d 19, 23 (2d Cir. 1999).  As applied to the instant case, certain relief sought by Plaintiff is not cognizable under Section 1983 whereas other claims remain viable.

  "[W]hen a state prisoner is challenging the very fact or duration of his physical imprisonment, and the relief he seeks is a determination that he is entitled to immediate release or a speedier release from that imprisonment, his sole federal remedy is a writ of habeas corpus." *Preiser v. Rodriguez*, 411 U.S. 475, 499 (1973).  In its opinions on this subject the Supreme Court

"has focused on the need to ensure that state prisoners use only habeas corpus (or similar state) remedies when they seek to invalidate the duration of their confinement—either directly through an injunction compelling speedier release or indirectly through a judicial determination that necessarily implies the unlawfulness of the State's custody." *Wilkinson v. Dotson*, 544 U.S. 74, 81, 125 S. Ct. 1242, 1247, 161 L. Ed. 2d 253 (2005).

Plaintiff has disclaimed seeking his immediate release through the instant motion. Instead, the relief sought here is prospective – *i.e.*, once he is released (the timing of which is not guided by this Opinion) Defendants are enjoined from enforcing a no-contact or supervised release condition interfering with Plaintiff's right to familial association with J.C. By framing the relief sought as prospective, it appears Plaintiff is attempting to bring this case within the ambit of *Wilkinson*, where the Supreme Court found a Section 1983 claim seeking a permanent injunction ordering prison officials to grant an immediate parole hearing did not in effect seek "an injunction ordering his immediate or speedier release into the community." *Wilkinson*, 544 U.S. at 82. Plaintiff would have benefitted by being much clearer in terms of what relief he is seeking rather than simply disclaiming any request for immediate release. Indeed, the initial moving papers only sought to prohibit DOCCS from implementing a no-contact condition and his reply papers call into question the constitutional validity of the supervised visitation condition without clearly stating whether he seeks to enjoin the application of a supervised visitation condition. During oral argument, Plaintiff's counsel seemed to suggest that Plaintiff sought to enjoin Defendants from implementing both conditions.

In any event, *Wilkinson* does not instruct that a plaintiff can rescue a Section 1983 claim otherwise attacking the duration or validity of his incarceration by merely disclaiming relief in the form of release from prison. For example, the district court in *D'Angelo v. Annucci* held that a

parolee's damages claim under the Fifth, Eighth, and Fourteenth Amendment based upon DOCCS' failure to release him to SARA-compliant housing after his release date were barred under *Heck v. Humphrey*, 512 U.S. 477 (1994), as those claims would necessarily invalidate his incarceration. 2017 WL 6514692, at *7 (S.D.N.Y. Dec. 19, 2017).  Even though the plaintiff in that case was already released from prison, his challenge to prison procedures evaluating his housing application were considered sufficiently related to the validity of his incarceration as to be barred under *Heck*. Likewise, in *Ahlers v. Boruch*, the district court distinguished types of claims based upon whether those claims would imply the invalidity of confinement.  No. 04 CV 1747 (JG), 2007 WL 2042794 (E.D.N.Y. July 16, 2007).  On the one hand, a claim asserting that DOCCS unconstitutionally delayed conditional release by refusing to investigate the suitability of proposed residences was barred under *Heck* because it necessarily attacked prison procedures for approving residences precedent to the prisoner's release and would necessarily imply that the prisoner's confinement was invalid.  *Id.* at *4.  By contrast, claims that parole officers repeatedly refused to inform a prisoner in writing of any decision as to the suitability of proposed residences would not require his immediate release because the failure to provide notice did not itself prolong his confinement. *Id.*

Here, the Court thinks a similar distinction can be drawn between actionable and non-actionable portions of Plaintiff's claims.  To the extent that Plaintiff seeks damages arising from the length of his incarceration occasioned by Defendants' enforcement of parole conditions preventing his association with J.C., it would seem to be barred as "success in that action would necessarily demonstrate the invalidity of confinement or its duration." *Wilkinson*, 544 U.S. at 81–82; *see also Edwards v. Balisok*, 520 U.S. 641, 648 (1997) (finding that a prisoner's claim for money damages alleging that he was deprived of good-time credits without due process necessarily

implies the invalidity of the "punishment imposed," meaning the deprivation of the credits).  The Court is not inclined to find "some likelihood" that Plaintiff will prevail on his claims to the extent they are seeking damages arising from the length of his incarceration.

To the extent that Plaintiff challenges the prospective enforcement of a no-contact condition, and seeks to enjoin Defendants from enforcing such a condition, that claim is not barred under *Heck* as enjoining Defendants from enforcing a no-contact condition does not result in Plaintiff's immediate release, and thus does not call into question the validity of Plaintiff's incarceration.  Defendants' basis for continuing to detain Plaintiff is that: (1) no SARA-compliant housing is available and (2) Plaintiff's mother's residence is not permissible insofar as J.C. resides there and Plaintiff cannot live with her pursuant to the conditions of his release.  Even if the no-contact condition was removed, Defendants continued incarceration of Plaintiff (pending approval of a SARA-compliant residence) would not be implicitly invalid as Defendants could still withhold approval of Plaintiff's proposed residence with his mother and J.C. on the grounds that it would run afoul of their new parole condition of supervised visitation.

To the extent that Plaintiff seeks an order from this Court invalidating Defendants' imposition of a supervised visitation condition, such an order would necessarily imply the invalidity of his incarceration.  As Defendants represent, the only fact in existence that prevents Plaintiff's immediate release is that DOCCS will not approve his mother's residence so long as J.C. lives there in order to vindicate their parole condition requiring supervised visitation.  (*See* Osouna Decl. ¶ 20 (noting that "Plaintiff would be permitted to reside in his mother's home—and therefore be immediately released—in the event that Plaintiff's daughter no longer resides in the home, or in the event Plaintiff's daughter's foster care situation changes.").  To the extent that this Court invalidated that supervised visitation condition, Defendants would, by their own admission,

no longer have any basis for detaining him, and his continued detention and its duration would be invalid both prospectively and retroactively (to the extent his incarceration after the February 2021 investigation was predicated exclusively on the existence of a supervised release condition).  *See* *Ahlers*, 2007 WL 2042794, at \*4 ("It is now established that the *Heck* bar applies to § 1983 challenges to 'internal prison proceedings,' provided the 'success' of the challenge 'would necessarily demonstrate the invalidity of confinement or its duration,'. . . even if the challenge attacks post-sentence confinement") (internal citation omitted).  Though Plaintiff disclaims seeking immediate release, the effect of his requested injunction would implicate the validity of his incarceration insofar as it renders the sole basis for detaining him invalid, and district courts in *Ahlers* and *D'Angelo* have previously held that attacking unconstitutional procedures, including those relating to approval of SARA-compliant residences, are not cognizable under Section 1983.

Nonetheless, to the extent that Plaintiff seeks to enjoin Defendants from using a constitutionally inadequate investigation to support a finding that supervised visitation is necessary, that claim is viable but only insofar as it: (1) does not require his immediate release and (2) merely requires Defendants to conduct a new investigation consonant with Plaintiff's substantive due process rights and thereafter, based on Defendants' findings, either continue to impose a condition of supervised visitation, impose a lesser restriction, or withdraw any restrictions based on their own assessment.  Requiring Defendants to prospectively conduct a new investigation does not require his immediate release and would not invalidate his confinement regardless of the outcome of Defendants' new investigation.  *See, e.g.*, *Wilkinson v. Dotson*, 544 U.S. 74, 82, 125 S. Ct. 1242, 1248, 161 L. Ed. 2d 253 (2005) (finding challenge to state procedures denying parole eligibility but only seeking relief in form of a new eligibility review was cognizable under Section 1983 because it did not require immediate or speedier release into the community);

*Wolff v. McDonnell*, 418 U.S. 539, 555 (1974) (holding that "it was proper for the Court of Appeals and the District Court to determine the validity of the procedures for revoking good-time credits and to fashion appropriate remedies for any constitutional violations ascertained, short of ordering the actual restoration of good time already canceled."); *Ahlers*, 2007 WL 2042794, at *4 (finding challenge to DOCCS' failure to provide written notice as to suitability of proposed residences for parolee's release not barred by *Heck*).

*       *       *

Accordingly, Plaintiff has demonstrated "some likelihood" that he will prevail on his claims seeking prospective injunctive relief concerning the enforcement of a no-contact condition to his release and claims seeking injunctive relief in the form of a constitutionally adequate investigation in response to his request for association with J.C.  By contrast, pursuant to *Heck*, Plaintiff has not demonstrated "some likelihood" that he will prevail to the extent he is seeking damages arising from his incarceration to the extent such damages invalidate his incarceration and he is not entitled to an injunction barring Defendants from enforcing a supervised visitation condition to the extent that it would require his immediate release and invalidate his current and prior incarceration at Fishkill RTF.

## IV.        Balance of Equities

Plaintiff argues that the balance of equities favors injunctive relief because it would: (1) vindicate Plaintiff's constitutional rights, (2) permit Plaintiff to provide assistance to his mother and daughter in terms contributing to expenses, caretaking, and household chores, (3) mitigate Plaintiff's increasing anxiety from being kept away from his family; and (4) defendants do not have an interest in detracting from the welfare of Plaintiff's family by imposing an overbroad condition preventing him from residing with J.C.  (*See* Pl's Mem. at 13-15.)  Defendants argue that granting relief beyond permitting supervised visitation—*i.e.*, permitting Plaintiff to have full

35

and unrestricted visitation to J.C., and to be released from custody without any approved residence in place—would either go against equity or jeopardize the safety of Plaintiff's child.  (*See* Defs' Opp. at 12-13.)

*First*, Defendants own determination that supervised release was sufficient to assure the protection of J.C. is nothing short of a concession that the equities favor Plaintiff to the extent he is seeking an injunction preventing Defendants' from enforcing a no-contact condition, and that is the primary injunctive relief that this Court will grant.  As discussed above, the Court has not found that Plaintiff is likely to succeed on a claim enjoining Defendants' from enforcing a supervised visitation condition (at this stage), and accordingly the equitable issues raised by Defendant, predicated on the inequity of releasing Defendant or granting unfettered visitation rights to Plaintiff, are largely irrelevant.

*Second*, the Court finds that Plaintiff has satisfied his burden of demonstrating that the balance of equities favors Plaintiff.  "The Second Circuit has concluded that, where a plaintiff alleges constitutional violations, the balance of hardships tips decidedly in the plaintiff's favor despite arguments that granting a preliminary injunction would cause financial or administrative burdens on the Government."  *Sajous v. Decker*, No. 18-CV-2447 (AJN), 2018 WL 2357266, at *13 (S.D.N.Y. May 23, 2018) (citing *Mitchell v. Cuomo*, 748 F.2d 804, 808 (2d Cir. 1984)).  Here, as in *Mitchell* and *Sajous*, the hardships that Plaintiff has alleged—*i.e.*, the risk of substantial constitutional harm to Plaintiff in the form of being denied access to his daughter—outweigh any administrative hardships that Defendants might experience in being enjoined from enforcing a no-contact condition, or being enjoined from enforcing supervised visitation on the basis of a flawed investigation.

## **CONCLUSION**

For the reasons stated above, Plaintiff's application for a preliminary injunction is GRANTED in part and DENIED in part. Plaintiff's application is granted to the extent it seeks to: (1) enjoin Defendants from enforcing a condition of release barring him from any contact with J.C.; and (2) enjoin Defendants from enforcing a condition of release requiring supervised visitation with J.C. but only to the extent it is based upon a constitutionally deficient investigation; and thus Defendants must conduct a new investigation into Plaintiff's parental contact request and may thereafter require supervised visitation or opt for a lesser restriction or no restriction based upon their findings. Plaintiff's application is denied to the extent it seeks to enjoin Defendants from enforcing a condition of supervised visitation *at this time* and to the extent it seeks his immediate release as such relief is not cognizable in a Section 1983 claim pursuant to the *Heck* doctrine.

The parties are ordered to jointly submit a Proposed Order GRANTING in part and DENYING in part Plaintiff's application for a preliminary injunction on or before June 18, 2021 memorializing the relief granted in this Opinion and spelling out both the process that Defendants must engage in to conduct a constitutionally adequate investigation and the specific timing of that investigation. Plaintiff is ordered to submit an initial draft to Defendants on or before June 14, 2021. Defendants are directed to submit any revisions on or before June 16, 2021. To the extent Plaintiff does not accept Defendants' revisions, a meet and confer is to take place on, or before, June 17, 2021. Thereafter, the parties are expected to jointly submit a Proposed Order on June 18, 2021. The Court would be surprised if the parties cannot come to an agreement on the terms of this Proposed Order but, to avoid any doubt, this Court is inclined to view any objection by Defendants as frivolous to the extent they cannot agree to, at a minimum, follow the process spelled out in DOCCS protocols for conducting parental contact investigations, and may impose costs.

The Court further orders Defendants to provide a copy of this Opinion to J.C.'s foster care agency, MercyFirst, and the relevant supervising agency, ACS, and to show proof of service on the docket.  As this Court mentioned during the hearing, J.C.'s actual legal guardians have a very clear interest in the resolution of this litigation insofar as it may motivate them to seek to vindicate the wellbeing of J.C. through applications to the Family Court.  This Court may, in the course of this litigation, grant relief that ACS and MercyFirst disfavor, so it behooves them to expeditiously seek whatever relief they desire in Family Court.

The Clerk of the Court is directed to terminate the motion at ECF No. 32.

Dated:   June 10, 2021                                           SO ORDERED:
         White Plains, New York

                                        _____
                                               NELSON S. ROMÁN
                                           United States District Judge