USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 10/29/2025

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SYDERIA PECK, Administrator of the Estate of
Tyler Averhart,

                                     Plaintiff,

        -against-

ANTHONY J. ANNUCCI, Acting Commissioner of
the New York State Department of Corrections and
Community Supervision; Bureau Chief MARK
PARKER; Senior Parole Officer CLARENCE R.
NEELY; and Parole Officer LINDSY OSOUNA,

                                     Defendants.

---

No. 21-CV-00383 (NSR)

**OPINION & ORDER**

NELSON S. ROMÁN, United States District Judge:

Plaintiff Syderia Peck, Administrator of the Estate of Tyler Averhart, ("Plaintiff") brings this action under 42 U.S.C. § 1983 against Anthony J. Annucci, Acting Commissioner of the New York Department of Corrections and Community Supervision, Bureau Chief Mark Parker, Senior Parole Officer Clarence R. Neely, and Parole Officer Lindsy Osouna (collectively, the "Defendants"). Plaintiff alleges that a condition of post-release supervision that prohibited Mr. Averhart from seeing his then 16-month-old daughter violated his substantive and procedural due process rights under the Fourteenth Amendment. Pending before the Court is Defendants' motion to dismiss. (ECF No. 61.) Defendants seek to dismiss the Complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).

For the following reasons, Defendants' motion to dismiss is GRANTED in part and DENIED in part.

## BACKGROUND

The following facts are drawn from Plaintiff's Complaint (ECF No. 1) and are assumed as true for purposes of this motion.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

### I.    Mr. Averhart's Conviction

Over twenty years ago, on November 19, 2004, Mr. Averhart pled guilty and was convicted of Rape in the First Degree pursuant to N.Y. Penal Law § 130.35(1).  (Compl. ¶ 13.)  Mr. Averhart's conviction stemmed from an incident in which he engaged in forced sexual relations with a 14-year-old girl.  (*Id*.)  Mr. Averhart was sentenced to a 12-year term of incarceration and 5-year term of post-release supervision.  (*Id*.)

### II.    Mr. Averhart's Incarceration and Conditions of Release

Mr. Averhart remained incarcerated for 13 years.  (*Id*. ¶¶ 13, 15.)  During that time, Mr. Averhart participated in a sex offender counseling and treatment program.  (*Id*. ¶ 14.)  Mr. Averhart was ultimately adjudicated as a Level 3 offender in November 2017.  (*Id*.)

On December 13, 2017, Mr. Averhart began parole supervision overseen by New York State's Department of Corrections and Community Supervision ("DOCCS").  (*Id*. ¶ 15.)  A special condition of his parole prohibited him from having any "contact with any person under the age of eighteen, without the written permission of [his parole officer]."  (*Id*.)  Nor could Mr. Averhart live within 1,000 feet of a school during his supervision period, in accordance with the Sexual Assault Reform Act ("SARA") pursuant to N.Y. Exec. Law § 259-c (14).  (*Id*.)

Prior to release, Mr. Averhart requested to live with Ms. Watson and Ms. Peck, his mother and sister, respectively, in Jamaica, Queens.  (*Id*. ¶ 16.)  DOCCS approved this request as SARA-compliant.  (*Id*.)

### III.    Mr. Averhart's Release from Prison and Rehabilitation

Upon release, Mr. Averhart purportedly began making positive strides towards his integration into society.  Mr. Averhart enrolled in a drug treatment program at the Fortune Society to help manage his struggle with substance abuse—an addiction he has dealt with since he was a teenager.  (*Id*. ¶ 17.)  Mr. Averhart also joined an 8-week culinary arts and industrial cooking training program, which led to full-time employment as an industrial cook at a homeless shelter.  (*Id*. ¶ 18.)  With his new employment, Mr. Averhart began contributing to rent and assisting Ms. Watson who was undergoing oral chemotherapy for chronic leukemia.  (*Id*. ¶ 20.)

Around sometime in 2018, Mr. Averhart met and began dating Jazmine McKenize.  (*Id*. ¶ 21.)  Early in their relationship, Mr. Averhart learned that Ms. McKenzie suffered from psychological episodes from a traumatic childhood and mental illness.  (*Id*. ¶ 22.)  Mr. Averhart and Ms. McKenzie eventually moved to a homeless shelter on Wards Island.  (*Id*. ¶ 23.)  They were, however, forced to sleep in different nearby shelters.  (*Id*.)  The homeless shelter was Mr. Averhart's only option given both his lack of resources and his SARA residency restriction.  (*Id*.)

In or around January 2019, Mr. Averhart learned that Ms. McKenzie was pregnant.  (*Id*. ¶ 24.)  Shortly after learning of the pregnancy, Mr. Averhart and Ms. McKenzie began shopping for baby supplies at the Salvation Army.  (*Id*.)  It was also around this time that Mr. Averhart lost his job and was left without income.  (*Id*. ¶ 25.)  Mr. Averhart ultimately experienced a relapse of substance abuse which resulted in two violations of his parole—occurring in February and May 2019.  (*Id*.)  Mr. Averhart was arrested and detained for both violations.  (*Id*.)  He was, however, released both times by DOCCS.  (*Id*.)

**IV.    Defendants' Alleged Ban on Contact Between Mr. Averhart and his Daughter**

After being released following his first parole violation in February 2019, Mr. Averhart was driven home by Defendant Osouna—his parole officer. (*Id*. ¶ 26.)  During their drive, Mr. Averhart informed Defendant Osouna that Ms. McKenzie was pregnant. (*Id*.)  Plaintiff alleges that Defendant Osouna warned Mr. Averhart that marriage "was not a good idea." (*Id*.)  Plaintiff also alleges that Defendant Osouna reminded Mr. Averhart of his special parole condition—that he would require written permission from his parole officer before having any contact with a minor, including his future child. (*Id*.)  Mr. Averhart purportedly protested that other parolees with similar post-release conditions were able to see their children. (*Id*.)  Mr. Averhart also expressed a desire to take responsibility for his daughter. (*Id*.)  Defendant Osouna allegedly did not change her position. (*Id*.)

Mr. Averhart was again informed after his second parole violation in May 2019 that he would be prohibited from seeing his child. (*Id*. ¶ 27.)  Specifically, Defendants Osouna and Neely—a senior parole officer—allegedly scolded Mr. Averhart for Ms. McKenzie's pregnancy and warned him that he would "never be around [his] child" because of his post-release conditions. (*Id*.)  Despite Mr. Averhart's purported protesting, Defendants Osouna and Neely did not change their position. (*Id*.)

On August 22, 2019, Ms. McKenzie informed Mr. Averhart that she went into labor. (*Id*. ¶ 28.)  When arriving at the hospital, however, Mr. Averhart was denied entry by hospital staff at the direction of his parole officers. (*Id*.)  The following day, Mr. Averhart traveled to a hospital in Midtown, Manhattan, where Ms. McKenzie was transferred, only to be denied entry again by hospital staff at the direction of his parole officers. (*Id*. ¶ 29.)  Consequently, Mr. Averhart missed the birth of his daughter, J.C., and failed to sign her birth certificate. (*Id*.)

After learning that Mr. Averhart was denied entrance, Ms. McKenzie suffered from a psychological episode and began acting erratically towards hospital staff. (*Id.* ¶ 30.) Ms. McKenzie was transferred and then admitted to the inpatient psychiatric unit. (*Id.*) Following this incident, Ms. Watson and Ms. Peck began taking care of J.C. (*Id.* ¶ 31.) J.C. was ultimately placed with Ms. Watson and Ms. Peck on August 27, 2019, and was then approved by MercyFirst, a foster care agency, for a formalized foster care placement with them in October 2019. (*Id.*) Plaintiff alleges that sometime after J.C.'s placement, Defendant Osouna warned Ms. Watson that Mr. Averhart would be arrested if caught visiting J.C. (*Id.* ¶ 32.)

**V.    Mr. Averhart's Return to Prison and Attempts to Obtain Release**

Shortly after J.C.'s birth, Mr. Averhart once again relapsed from substance abuse. (*Id.* ¶ 33.) Despite Mr. Averhart checking into an impatient rehabilitation program, he departed after a few days resulting in the revocation of his post-release supervision on September 9, 2019. (*Id.*) Mr. Averhart was resentenced to one year in prison. (*Id.*)

During his reincarceration, Plaintiff alleges that Mr. Averhart attempted to stay in contact with J.C. Mr. Averhart called Ms. Watson almost every day to speak with J.C. (*Id.* ¶ 36.) Mr. Averhart also sang and read to J.C. (*Id.*) When J.C. turned 16-months old, her first purported words were "dada." (*Id.* ¶ 37.)

After a year, Mr. Averhart was scheduled to be released and returned to post-release supervision on September 6, 2020. (*Id.* ¶ 38.) In anticipation of being released, Mr. Averhart proposed to once again live with Ms. Watson and Ms. Peck. (*Id.* ¶ 39.) Defendants, however, rejected Mr. Averhart's proposal, citing the condition of his parole preventing him from seeing J.C. without their permission. (*Id.* ¶ 40.) Plaintiff alleges that Defendants failed to inform Mr. Averhart why the no-contact condition was necessary. (*Id.*) Because of the scarcity of SARA-compliant

housing shelters in New York City, Mr. Averhart remained incarcerated at a residential treatment facility within the Fishkill Correctional Facility.  (*Id.* ¶ 42.)

To assist with his release, on August 9, 2021, Mr. Averhart's counsel wrote to Kathleen M. Kiley, counsel to the Board of Parole, and Defendant Parker, a parole bureau chief, to protest Mr. Averhart's no-contact condition.  (*Id.* ¶ 46.)  The letter argued that Mr. Averhart was not provided an individualized justification for the no-contact condition and requested that the condition be lifted.  (*Id.*)  In response, Defendant Parker wrote back explaining that Mr. Averhart could not live with J.C. because of his negative adjustment to parole.  (*Id.* ¶ 47.)  Plaintiff, however, alleges that Defendants never believed that Mr. Averhart posed a threat to J.C.  (*Id.* ¶ 45.)  For instance, in sometime around September 2020, Defendant Osouna purportedly messaged Ms. Watson that "[n]one of us think [Mr. Averhart would] hurt [J.C.]" (*Id.*)  Plaintiff further alleges that Defendant Parker's explanation contradicts DOCCS's protocol permitting parental restrictions to "protect a [person's] child(ren) from harm or danger."  (*Id.* ¶ 47.)

Specifically, DOCCS's Parental Contact Protocol (the "Protocol") creates an administrative scheme that DOCCS must follow to impose conditions of parole and post-release supervision that constrains individuals from having contact with their children.  (*Id.* ¶ 48.)  Under the Protocol, DOCCS must provide written notice to individuals about their ability to exercise their parental rights and the process for contesting any no-contact restriction.  (*Id.* ¶ 49.)  To justify any parental restrictions, DOCCS must conduct an investigation to determine whether the child at issue requires protection from danger presented by the parent.  (*Id.* ¶ 50.)  As part of the investigation, DOCCS must interview the child's other parent or caretaker, as well as "collateral sources of information as appropriate," such as sex offender treatment providers, family members, employers, and friends and family members.  (*Id.*)  DOCCS must also consider the history of the person's

contact with their child, including any limited contact while incarcerated, the person's risk of re-offending, and the age of the person's prior victim as compared to their child.  (*Id.*)

Upon the investigation's conclusion, DOCCS must determine the "least restrictive conditions reasonably necessary and appropriate for a [person] to properly exercise his or her parental rights, while protecting [the child] from harm or danger."  (*Id.* ¶ 51.)  DOCCS must provide its written decision denying parental contact, and that decision must explain the reason for the denial.  (*Id.* ¶ 52.)  DOCCS must also inform the parent of their opportunity to be heard on appeal and provide a written "notice of appeal" that the parent can submit to appeal any parental restriction.  (*Id.*)

Plaintiff alleges that Defendants did not follow this Protocol.  (*Id.* ¶ 53.)  Plaintiff specifically alleges that Defendants failed to (1) provide Mr. Averhart written notice of a parental restriction; (2) conduct an investigation, including interviewing Ms. Watson and Ms. Peck, to determine whether Mr. Averhart presented a danger to J.C.; (3) consider less restrictive alternatives instead of enforcing a no-contact condition; and (4) provide Mr. Averhart with a written determination explaining the reasoning behind the no-contact condition, a written notice of appeal, or any opportunity to be heard on why the ban is unjustified.  (*Id.* ¶¶ 54–57.)

## PROCEDURAL HISTORY

On January 15, 2021, Plaintiff commenced this action.  (ECF No. 1.)  Shortly thereafter, Plaintiff moved for a preliminary injunction on January 20, 2021.  The Court granted in part and denied in part Plaintiff's motion on June 10, 2021.[1]  (ECF No. 58.)  After the resolution of

---

[1] The Court (1) enjoined Defendants from enforcing a condition of release baring Mr. Averhart from any contact with J.C. and (2) enjoined Defendants from enforcing a condition of release requiring supervised visitation with J.C. but only to the extent it was based upon a constitutionally deficient investigation.  (ECF No. 55.)  The Court also denied Plaintiff's motion to the extent it sought to enjoin Defendants from enforcing a condition of supervised visitation at that time and to the extent it sought Mr. Averhart's immediate release as such relief is not cognizable in a Section 1983 claim pursuant to the *Heck* doctrine.  (*Id.*)

Plaintiff's preliminary injunction. Defendants moved to dismiss the Complaint on August 5, 2021. (ECF No. 61.)  Plaintiff opposed the motion.  (ECF No. 66.)  Defendants filed a reply memorandum in further support of their motion.  (ECF No. 64.)  On November 16, 2021, Plaintiff filed a motion suggestion of death upon the record, notifying the Court that Mr. Averhart died on or about November 9, 2021.  (ECF No. 67.)  The Court permitted Plaintiff's counsel to move to substitute a party for Mr. Averhart on November 19, 2021.  (ECF No. 68.)  On March 22, 2023, the Court stayed this case in light of a concurrent proceeding in the Surrogate Court determining who would serve as the Mr. Averhart's estate administrator.  (ECF No. 82.)  On August 8, 2025, Plaintiff's counsel informed the Court that the Surrogate Court appointed Ms. Peck as the Mr. Averhart's estate administrator and requested that she substitute as Plaintiff to prosecute this case.  (ECF No. 100.)  On September 9, 2025, the Court vacated the stay and substituted Ms. Peck as Plaintiff. (ECF No. 103.)

## LEGAL STANDARD

### I.    Federal Rule of Civil Procedure 12(b)(1)

Under Federal Rules of Civil Procedure 12(b)(1), "[a] case is properly dismissed for lack of subject matter jurisdiction… when the district court lacks the statutory or constitutional power to adjudicate it." *Nike, Inc. v. Already, LLC*, 663 F.3d 89, 94 (2d Cir. 2011) (citation and internal quotations omitted).  "A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists."  *Morrison v. Nat'l Australia Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008) (quoting *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000)).  In assessing whether there is subject matter jurisdiction, the Court must accept as true all material facts alleged in the complaint, *Conyers v. Rossides*, 558 F.3d 137, 143 (2d Cir. 2009).  Without jurisdiction, the Court is devoid of the "power to adjudicate the merits of the case" and for that

reason, a court must decide a Rule 12(b)(1) motion before any motion on the merits.  *Carter v. HealthPort Tech., LLC*, 822 F.3d 47, 55 (2d Cir. 2016).

## II.    Federal Rule of Civil Procedure Rule 12(b)(6)

Under Federal Rule of Civil Procedure 12(b)(6), dismissal is proper unless the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  When there are well-pled factual allegations in the complaint, "a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief."  *Id*. at 679.

While the Court must take all material factual allegations as true and draw reasonable inferences in the non-moving party's favor, the Court is "not bound to accept as true a legal conclusion couched as a factual allegation," or to credit "mere conclusory statements" or "[t]hreadbare recitals of the elements of a cause of action."  *Id*. at 678 (quoting *Twombly*, 550 U.S. at 555).  "Because a Rule 12(b)(6) motion challenges the complaint as presented by the plaintiff, taking no account of its basis in evidence," this Court "may review only a narrow universe of materials."  *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016).  The critical inquiry is whether the plaintiff has pled sufficient facts to nudge the claims "across the line from conceivable to plausible."  *Twombly*, 550 U.S. at 570.  A motion to dismiss will be denied where the allegations "allow[ ] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678.

## III.    Section 1983 Claims

"Section 1983 itself creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere."  *Sykes v. James*, 13 F.3d 515, 519 (2d Cir. 1993) (citing *City of Okla. City v. Tuttle*, 471 U.S. 808, 816 (1985)).  "To state a claim under

Section 1983, a plaintiff must allege facts indicating that some official action has caused the plaintiff to be deprived of his or her constitutional rights." *Zherka v. Amicone*, 634 F.3d 642, 644 (2d Cir. 2011) (citing *Colombo v. O'Connell*, 310 F.3d 115, 117 (2d Cir. 2002) (per curiam)); *see also Ross v. Westchester Cnty. Jail*, 2012 WL 86467, at *9 (S.D.N.Y. Jan. 11, 2012). A defendant's conduct must therefore be a proximate cause of the claimed violation in order to find that the individual defendant deprived the plaintiff of his constitutional rights. *Ross*, 2012 WL 86467, at *9 (citing *Martinez v. California*, 444 U.S. 277, 285 (1980)). Additionally, a plaintiff seeking monetary damages against the defendant must show personal involvement on the part of the defendant in the alleged constitutional deprivation as a prerequisite to recovery under § 1983. *Farid v. Ellen*, 593 F.3d 233, 249 (2d Cir. 2010) (citing *Farrell v. Burke*, 449 F.3d 470, 484 (2d Cir. 2006)).

## DISCUSSION

Plaintiff alleges that Defendants violated Mr. Averhart's substantive and procedural due process rights under the Fourteenth Amendment by enforcing the no-contact condition of his post-release supervision which prevented him from having contact with J.C. (Compl. ¶¶ 61–62.) Plaintiff seeks both injunctive and monetary relief. (*Id*.) Defendants seek to dismiss both of Plaintiff's claims pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). ("Defs. Mot.," ECF No. 62.)

### I.    Threshold Issues

#### a.    Ripeness

As a threshold matter, Defendants move to dismiss Plaintiff's claims as not being ripe for judicial review. [2] (Defs. Mot. at 4–5.) "To be justiciable, a cause of action must be ripe—it must

---

[2] Defendants' opening motion did not specify whether it was only seeking to dismiss Plaintiff's injunctive relief claims under the ripeness doctrine. (Defs. Mot. at 4–5.) Plaintiff opposed the dismissal of both injunctive and monetary

present 'a real, substantial controversy, not a mere hypothetical question.'" *BMG Monroe I, LLC v. Vill. of Monroe*, 2022 WL 1094538, at *11 (S.D.N.Y. Apr. 12, 2022), *aff'd*, 93 F.4th 595 (2d Cir. 2024) (quoting *AMSAT Cable Ltd. v. Cablevision of Conn.*, 6 F.3d 867, 872 (2d Cir. 1993). "A claim is not ripe if it depends upon 'contingent future events that may or may not occur as anticipated, or indeed, may not occur at all.'" *Id.* (quoting *Thomas v. Union Carbide Agr. Prod. Co.*, 473 U.S. 568, 580–81 (1985)); *see also Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals*, 282 F.3d 83, 90 (2d Cir. 2002) ("The ripeness requirement prevents a federal court from entangling itself in abstract disagreements over matters that are premature for review because the injury is merely speculative and may never occur, depending on the final administrative resolution.").

Defendants assert Plaintiff's claims as not being ripe for judicial review because Mr. Averhart was not subject to the no-contact condition while awaiting release from DOCCS custody. (Defs. Mot. at 4–5.) As discussed in more detail below, because of Mr. Averhart's untimely death, Plaintiff's request for injunctive relief is dismissed as moot because he can no longer benefit from a favorable injunction. However, Plaintiff also seeks monetary damages from the alleged violations of his substantive and procedural due process rights under the Fourteenth Amendment. (Compl. ¶¶ 61–62.) While Defendants correctly note that Mr. Averhart's post-release supervision was revoked on or around September 9, 2019, Plaintiff nevertheless alleges that Mr. Averhart was subject to the no-contact condition from December 13, 2017 until his reincarceration. ("Pl. Opp.," ECF No. 66 at 9–10.) For instance, Plaintiff alleges that he was denied entry from attending J.C.'s birth at the direction of his parole officers. (Compl. ¶¶ 28–29.) Moreover, while Defendants assert that Mr. Averhart was no longer subject to the no-contact condition due to his reincarceration,

_____

relief. (Pl. Opp. at 9–10.) While Defendants' reply memorandum only responds to Plaintiff's injunctive relief arguments, the Court nevertheless addresses the issue in its entirety. (Defs. Rep. at 2–3.)

Plaintiff alleges that he only remained incarcerated because of Defendants' enforcement of the condition. (*Id.* ¶¶ 38–42.) Mr. Averhart was scheduled to be released and returned to post-release supervision on September 6, 2020 but remained incarcerated because Defendants rejected his proposal to live at Ms. Watson and Ms. Peck's residence, specifically citing the condition of his parole preventing contact with J.C. (*Id.* ¶ 40.)

Therefore, the Court holds that Plaintiff's monetary claims are fit for review because none of "the issues sought to be adjudicated are contingent on future events [that] may never occur.'" *New York v. U.S. Dep't of Health & Human Servs.*, 414 F. Supp. 3d 475, 563–64 (S.D.N.Y. 2019) (quoting *New York C.L. Union v. Grandeau*, 528 F.3d 122, 132 (2d Cir. 2008)).

### b. Mootness

Defendants also move to dismiss Plaintiff's injunctive relief claims under the mootness doctrine. (Defs. Mot. at 6–7.) Specifically, Plaintiff seeks injunctive relief to enjoin the enforcement of Defendants' no-contact condition. (Compl. ¶¶ 61–62.) Defendants, however, dropped this argument in their reply memorandum. ("Defs. Rep.," ECF No. 64.) The Court must nevertheless address Plaintiff's injunctive relief claims considering Mr. Averhart's untimely death.

Under Federal Rule of Civil Procedure Rule 25(a), "if a party dies and the claim is not extinguished, the court may order substitution of the proper party." *Mtume v. Sony Music Ent.*, 2022 WL 1556167, at *1 (S.D.N.Y. May 16, 2022) (quoting *Adler v. Bank of Am.*, 2015 WL 2330171, at *1 (S.D.N.Y. Mar. 24, 2015)). The Court granted the unopposed motion made by Ms. Peck—the administrator of Mr. Averhart's estate—to be substituted as Plaintiff. (*See* ECF No. 103.) Because this matter was brought under Section 1983, New York law governs whether Mr. Averhart's claims survive his death. *Duchesne v. Sugarman*, 566 F.2d 817, 822 n.2 (2d Cir. 1977) ("It is well-settled that pursuant to 42 U.S.C. § 1988 state survival statutes are applicable to civil

rights actions brought under 42 U.S.C. § 1983."). Under New York law, a claim for damages asserted under Section 1983 is not rendered moot upon a plaintiff's death. *See Campos v. Weissman*, 2009 WL 7771872, at *4 (N.D.N.Y. 2009) (if a person had a cause of action under Section 1983, the cause of action survives for the benefit of that decedent's estate where applicable state law creates a right of survival; under New York law, a personal injury claim like those asserted under Section 1983 survives); *see also Barrett v. United States*, 689 F.2d 324, 331 (2d Cir.1982) (Section 1983 actions survive death).

However, when a "plaintiff dies… before [his] request for prospective injunctive relief is resolved, [his] claims may in some circumstances become moot." *ABN Amro Verzekeringen BV v. Geologistics America, Inc.*, 485 F.3d 85, 94 (2d Cir. 2007). Courts in the Second Circuit have dismissed claims seeking only prospective injunctive relief in similar circumstances. *See, e.g.*, *J.L. behalf of v. New York City Dep't of Educ.*, 2024 WL 2864330, at *12 (S.D.N.Y. Jan. 26, 2024), *report and recommendation adopted in part sub nom.*, 2024 WL 2700563 (S.D.N.Y. May 24, 2024) ("the… deaths of [plaintiffs]… have rendered [their] claims for… injunctive relief moot."); *Grinblat v. Nulife of Brooklyn, LLC*, 2021 WL 1193147, at *1 (E.D.N.Y. Mar. 30, 2021) ("Title III ADA claims become moot when the plaintiff died because the only relief available is injunctive relief, and injunctive relief cannot benefit a deceased plaintiff."); *Boddie v. Evans*, 2011 WL 1085159, at *2–3 (E.D.N.Y. Mar. 21, 2011) (dismissing constitutional claims against parole board for prospective injunctive relief because "[a]fter plaintiff's death, it is no longer feasible to order a new hearing or to order his release").

Likewise, Plaintiff's request to enjoin the enforcement of Mr. Averhart's no-contact condition of his post-release supervision is now moot because he can no longer benefit from a favorable injunction. *See Nachshen v. BPP ST Owner LLC*, 2021 WL 5042855, at *2 (S.D.N.Y.

Oct. 29, 2021) ("plaintiff's claims for injunctive and declaratory relief were extinguished after his death."). Therefore, the Court dismisses Plaintiff's injunctive relief claims with prejudice.

### c. Eleventh Amendment Immunity

Finally, Defendants move to dismiss all claims against them in their official capacity. (*See* Defs. Mot. at 7–9.) Defendants assert that sovereign immunity under the Eleventh Amendment bars all monetary damages claims against Defendants in their official capacities. (*Id*. at 7.) Defendants also assert that all claims against Defendant Annucci—who Plaintiff only sues in his official capacity—should similarly be dismissed. (*Id*. at 9.) The Court agrees.

Absent abrogation by Congress, a state is immune from suit in federal court. *See Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 54–56 (1996); *see also Dube v. State Univ. of New York*, 900 F.2d 587, 594 (2d Cir. 1990). This immunity extends to "arms of the state," which includes "officers employed by agencies such as" the DOCCS. *Dube*, 900 F.2d at 594–95 (finding SUNY institution entitled to sovereign immunity); *see also Matteo v. Perez*, 2017 WL 4217142, at *7 (S.D.N.Y. Sept. 19, 2017). Section 1983 claims against state officers in their official capacity are ripe for dismissal, as those officials are not considered "person[s] within the meaning of the statute." *Id*. (citing *Reynolds v. Barrett*, 685 F.3d 193, 204 (2d Cir. 2012); *Koehl v. Dalsheim*, 85 F.3d 86, 88–89 (2d Cir. 1996) for proposition that Section 1983 claims based on official capacity barred by sovereign immunity).

In a limited exception to their Eleventh Amendment immunity, state employees can be sued in their official capacities in federal court where the "complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *See Office for Prot. & Advocacy v. Stewart*, 563 U.S. 247, 254–56 (2011) (quoting *Verizon Md. Inc. v. Public Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002) and citing *Ex parte Young*, 209 U.S. 123 (1908)); *Will*

*v. Mich. Dep't of State Police*, 491 U.S. 58, 66 (1989); *Mary Jo C. v. N.Y. State & Local Ret. Sys.*, 707 F.3d 144, 152 (2d Cir. 2013), *cert. dismissed*, 569 U.S. 1040 (2013); *KM Enterprises, Inc. v. McDonald*, 518 F. A'ppx 12, 13 (2d Cir. 2013).

Consequently, "the Fourteenth Amendment claims against Defendants in their official capacity cannot stand" because they are protected by the Eleventh Amendment's immunity. *See Williams v. Annucci*, 2018 WL 3148362, at *10 (S.D.N.Y. June 27, 2018) (dismissing Section 1983 claims against Defendant Annucci and other DOCCS employees in their official capacity under the Eleventh Amendment). Plaintiff also fails to benefit from the Eleventh Amendment's exception to prospective injunctive relief because, as discussed above, Plaintiff's request for injunctive relief is dismissed as moot considering Mr. Averhart's untimely death. Therefore, the Court dismisses all claims against Defendants in their officially capacity with prejudice.

## II.   Plaintiff's Substantive Due Process Claim

Plaintiff alleges that Defendants violated Mr. Averhart's substantive due process rights under the Fourteenth Amendment by enforcing the no-contact condition of his post-release supervision that prevented him from contacting J.C. (Compl. ¶ 61.) Defendants move to dismiss Plaintiff's claim asserting that Defendants did not cause Mr. Averhart's separation from J.C. and that the no-contact condition was reasonably and necessarily related to the government's interest in protecting J.C. (Defs. Mot. at 10.) At this juncture, the Court disagrees.

### a.   Liberty Interest

"It is well established that a parent's interest in maintaining a relationship with his or her child is protected by the Due Process Clause of the Fourteenth Amendment." *United States v. Myers*, 426 F.3d 117, 125 (2d Cir. 2005) (emphasis added) (citing *Wilkinson v. Russell*, 182 F.3d 89, 103–04 (2d Cir. 1999)); *see also United States v. McGeoch*, 546 F. App'x 44, 48 (2d Cir. 2013)

(summary order) ("A condition of supervised release that prevents a father from seeing his children outside the presence of an approved monitor is a severe one subject to careful scrutiny."). Nonetheless, the degree of "protection varies in accordance with the nature of the parent-child bond." *Yunus v. Robinson*, 2018 WL 3455408, at *34 (S.D.N.Y. June 29, 2018); *see also Meyers*, 426 F.3d at 128 (remanding for fact-finding where the supervised releasee had never been the child's custodian and presented "no evidence" in support of his claim that he played "an active role in the life of his son" before he was incarcerated); *Doe v. Lima*, 270 F. Supp. 3d 684, 701–03 (S.D.N.Y. 2017), *aff'd sub nom. Doe v. Cappiello*, 758 F. App'x 181 (2d Cir. 2019) (applying strict scrutiny where state police officers expelled sex offender parolee from his marital home after his wife gave birth to a son, without conducting any individualized inquiry into whether parolee was a danger to the infant).

In situations not dissimilar from the instant case, where a father's legal rights and relationship with his child are somewhat compromised, the Second Circuit has been hesitant to set forth bright line rules as to what facts give rise to an inference that an unwed father has a defined liberty interest in associating with his child. For instance, in *United States v. Donahue*, the Second Circuit found that the district court, in its capacity sentencing the defendant to supervised release conditions barring contact with his child, did not have a sufficient record to determine whether defendant's relationship with his son was sufficiently established to merit constitutional protection. 726 F. App'x 3 (2d Cir. 2018). In that case, defendant maintained that "he had a relationship with his son while incarcerated and wishe[d] to continue such a relationship" whereas the government alleged that defendant's son lived out of state and that defendant had no role in his upbringing and that he had not officially established paternity. *Id.* at 7. In *United States v. Myers*, the Second Circuit acknowledged that where a party fails to "establish a legally cognizable interest as a parent

of a child in foster care born out of wedlock" it follows that the court "cannot determine whether [a no-contact supervised release condition] is appropriately tailored to satisfy the goals of sentencing." 426 F.3d at 129. Accordingly, further fact finding was required on remand as to whether the supervisee had demonstrated a "full commitment to the responsibilities of parenthood by coming forward to participate in the rearing of his child", and the Second Circuit noted that, among relevant factors to this inquiry would be the "ultimate resolution of [supervisee's] attempts to gain visitation rights." *Id.* at 129.

To be sure, federal courts have not meaningfully established the contours of what constitutes a demonstration of full commitment to the responsibilities of parenthood. This dearth of relevant guidance is likely attributable to "domestic relations law [being] almost exclusively the province of the states." *Brissett v. Ashcroft*, 363 F.3d 130, 133 (2d Cir. 2004). New York courts and its legislature, by contrast, have attempted to flesh out what factors give rise to a showing that the unwed father has engaged in a full commitment to the responsibilities of parenthood. In the context of judicial proceedings where an unwed non-custodial biological father seeks to object to the adoption of his child, the New York Court of Appeals has considered the following factors: (1) "a prompt assertion of an interest in assuming custody"; (2) "public acknowledgment of paternity," (3) "payment of pregnancy and birth expenses," (4) "steps taken to establish legal responsibility for the child," and (5) "other factors evincing a commitment to the child." *Raymond AA v. Doe*, 217 A.D.2d 757, 760 (3d Dep't 1995) (citing *Matter of Raquel Marie X.*, 76 N.Y.2d 387, 408 (1990)).

On the facts pled, and drawing all reasonable inferences in favor of Plaintiff, the Court finds that Mr. Averhart established a liberty interest in his familial association with J.C. Defendants assert that Mr. Averhart failed to make a full commitment to parenthood because he lost his job

and experienced relapses from substance abuse.  (Defs. Rep. at 6–7.)  Such arguments, however, ignore the meaningful steps evidencing Mr. Averhart's commitment to parenthood.  When discovering Ms. McKenzie was pregnant, Mr. Averhart began shopping for baby supplies at the Salvation Army.  (Compl. ¶ 24.)  Mr. Averhart consistently held out J.C. as his daughter including by announcing to Defendants Osouna and Neely on several occasions that he intended to marry Ms. McKenzie and raise J.C.  (*Id*. ¶¶ 26–27.)  Mr. Averhart also took steps to establish legal responsibility for his child by attempting to attend the birth of J.C.—during which time he could have obtained legal responsibility over her had he signed his daughter's birth certificate.  (*Id*. ¶ 29.)  Finally, Mr. Averhart evinced a commitment to J.C.'s childrearing and wellbeing by calling her daily from prison to speak, read, and sing to her.  (*Id*. ¶ 36.)  Based upon the aforementioned factors, the Court finds that Plaintiff sufficiently pleads that Mr. Averhart established a liberty interest in his familial association with J.C.

### b.  Narrowly Tailored

Having reached that Plaintiff sufficiently pleads a liberty interest, it follows that Defendants' "[r]estrictions on such protected liberty interests are subject to strict scrutiny."  *Lima*, 270 F. Supp. 3d at 702.  As is relevant here, "[t]he Second Circuit has applied strict scrutiny to restrictions on liberty incident to post-prison supervisory regimes, whether denominated as parole (as in New York State) or as supervised release (as in the federal system)."  *Id.*  To satisfy strict scrutiny, the imposition of a condition of parole or supervised release restricting familial association must be accompanied by an individualized inquiry into whether the risk factors associated with the parolee or supervisee pose a threat to the child.  *See, e.g.*, *McGeoch*, 546 F. App'x at 49 ("Absent an individualized inquiry into whether [plaintiff's] sexual proclivities pose a threat to his sons, however, the imposition of a harsh condition of supervised release that either

prohibits interaction with his children or makes such interaction subject to supervision by a person approved of by the probation officer violates [plaintiff's] due process rights.")

This individualized inquiry is not satisfied where state parole officers either wholesale failed to conduct an investigation, merely enforce a condition preventing familial association based on the nature of the crime committed, or where the purported bases for restricting familial association derived from an investigation are not sufficiently related to the safety of the child. *Lima*, 270 F. Supp. 3d at 704–07. For instance, evidence that a parolee had been convicted of rape involving manipulation of a minor in a family setting, statements by parolee denying his guilt, and the objection of parolee's victim did not permit an inference that the parolee was a danger to his infant son (who was not the victim of parolee's crime). *Id.*; *see also Doe v. Smith*, 2006 WL 383514, at *3 (N.D.N.Y. Feb. 16, 2006) (finding insufficient evidence to indicate that there was a rational basis for a ban contact between parolee and his child where there was, among other things, "nothing in the record to indicate that any of his arrests or convictions for sexual misconduct or endangering the welfare of a child involved a child who was even close to the age of his infant daughter, who is eleven-months old.")

Before the Court determines whether the no-contact condition was reasonably and narrowly tailored, the Court must first determine the applicable violation period of when it was possible for Defendants to allegedly violate Mr. Averhart's substantive due process rights. First, Defendants point out that on August 26, 2019—only three days after J.C.'s birth—the New York Family Court issued a Stay Away Order of Protection preventing Mr. Averhart from contacting J.C. (Defs. Rep. at 5–6.) The Stay Away Order of Protection appears to have expired on September 17, 2019. (Defs. Mot. at 12, 16; ECF No. 46.) Second, between September 9, 2019, to September 6, 2020, Mr. Averhart was reincarcerated—meaning he would have been unable to have contact with

J.C. (Compl. ¶ 32.) Thus, the Court will analyze whether Defendants' enforcement of the no-contact condition was reasonably and narrowly tailored (1) between August 23, 2019—the day J.C. was born—and August 26, 2019—when the New York Court issued the Stay Away Order of Protection; and (2) after September 6, 2020—when Mr. Averhart's most recent term of incarceration expired.

Beginning with the first period between August 23, 2019 and August 26, 2019, Defendants' enforcement of the no-contact condition does not appear to be justified based on the results of any individualized inquiry. This was the period before the New York Family Court issued the Stay Away Order of Protection preventing Mr. Averhart from contacting J.C. (Defs. Rep. at 5–6.) Nevertheless, Mr. Averhart was purportedly denied entry to witness J.C.'s birth by hospital staff at the direction of his parole officers. (Compl. ¶¶ 29.) Defendants' remaining argument is that J.C. would have been in danger if left alone with Mr. Averhart because of his struggle with substance abuse. (Defs. Mot. at 13.) However, nothing in the Complaint suggests that Mr. Averhart posed a threat when attempting to attend the birth of his daughter. Moreover, Plaintiff alleges that Defendants were never concerned that Mr. Averhart would physically harm J.C. (Compl. ¶ 45.)

Similarly, the Court finds that Defendants failed to conduct an individualized inquiry when preventing Mr. Averhart from contacting J.C. after September 6, 2020. Defendants' only argument is that Mr. Averhart could have potentially relapsed from substance abuse, endangering J.C. if left home alone. (Defs. Mot. at 13.) This concern is not without reason. Nevertheless, "[a]bsent an individualized inquiry… [the] imposition of a harsh condition of supervised release that… prohibits interaction with [supervisee's] children or makes such interaction subject to supervision by a person approved of by the probation officer violates [his] due process rights." *Doe v. Annucci*, 2015 WL 4393012, at *13 (S.D.N.Y. July 15, 2015) (quoting *McGeoch*, 546 F. App'x at 49). Here,

Plaintiff alleges that Defendants failed to provide Mr. Averhart "of any specific reason as to why the no-contact condition was necessary" when denying his proposal to live with J.C. (Compl. ¶ 40.) Furthermore, when Mr. Averhart's counsel requested more information, Defendant Parker purportedly responded that Mr. Averhart had a negative adjustment to parole. (*Id.* ¶ 45.) Nothing in the Complaint, however, indicates that Defendants performed an individualized inquiry as to why Mr. Averhart could not be in contact with J.C.

Therefore, the Court finds that Plaintiff sufficiently pleads a violation of his substantive due process rights under the Fourteenth Amendment.[3]

## III.    Plaintiff's Procedural Due Process Claim

Plaintiff similarly alleges that Defendants violated Mr. Averhart's procedural due process rights under the Fourteenth Amendment by enforcing the no-contact condition of his post-release supervision that prevented him from contacting J.C. (Compl. ¶ 62.) To state a procedural due process claim entitling Plaintiff to damages under Section 1983, Plaintiff must show that Defendants acted under color of state law and "(1) that Defendants deprived him of a cognizable interest in life, liberty, or property, (2) without affording him constitutionally sufficient process." *Parker v. Santiago*, 2024 WL 4769757, at *3 (S.D.N.Y. Nov. 13, 2024) (citing *Proctor v. LeClaire*, 846 F.3d 597, 608 (2d Cir. 2017) (internal quotation marks omitted)); *Bedoya v. Coughlin*, 91 F.3d 349, 351–52 (2d Cir. 1996). Additionally, "[p]leadings pursuant to § 1983 must contain 'more than mere conclusory allegations.'" *Richard v. Fischer*, 38 F. Supp. 3d 340, 351 (W.D.N.Y. 2014) (quoting *Salahuddin v. Cuomo*, 861 F.2d 40, 43 (2d Cir.1988)).

---

[3] Defendants also assert that their enforcement of the no-contact condition was not the proximate cause of Mr. Averhart's separation from J.C. (Defs. Mot. at 10–11.) However, as already noted, Plaintiff alleged that Mr. Averhart was denied entrance to J.C.'s birth at the direction of his parole officers—who were Defendants Osouna and Neely. (Compl. ¶¶ 28–29.) Moreover, Defendant Parker allegedly had a role in denying Mr. Averhart's proposal to live with J.C. (*Id.* ¶ 45.) On the facts pled, the Court cannot dismiss Plaintiff's claims for lack of proximate cause.

As discussed above, the Court finds that Plaintiff sufficiently pleads that Mr. Averhart established a liberty interest in his familial association with J.C.  The Court also finds that Plaintiff sufficiently pleads that Mr. Averhart was denied a constitutionally sufficient process in depriving him of his liberty interest.  Plaintiff specifically identifies the DOCCS Protocol that Defendants were required to follow when preventing Mr. Averhart from having contact with J.C.  (Compl. ¶¶ 48–52.)  According to Plaintiff, Defendants were required to (1) provide Mr. Averhart with written notice restricting his parental rights; (2) conduct  an investigation to determine whether Mr. Averhart presented a danger to J.C.; (3) consider less restrictive alternatives instead of enforcing a no-contact condition; and (4) provide Mr. Averhart with a written determination explaining the reasoning behind the no-contact condition, a written notice of appeal, or an opportunity to be heard on why the ban is unjustified.  (*Id.* ¶¶ 54–57.)

Defendants respond by asserting that Mr. Averhart was notified of the procedure for requesting contact with J.C. on September 2, 2020.  (Defs. Mot. at 13.)  This argument is unpersuasive because it ignores that Plaintiff is alleging that Defendants failed to follow the DOCCS Protocol before September 2, 2020, when denying Mr. Averhart from attending J.C.'s birth and then by rejecting his proposal to live at the same residence as J.C.[4]  (Compl. ¶¶ 28–29, 40.)  Plaintiff's allegations do not show that Defendants followed the DOCCS Protocol for both occasions.  Therefore, the Court finds that Plaintiff sufficiently pleads that Mr. Averhart was denied his procedural due process rights.  *See Doe v. Annucci*, 2015 WL 4393012, at *14 (S.D.N.Y. July 15, 2015) (quoting *Kia P. v. McIntyre*, 235 F.3d 749, 760 (2d Cir. 2000) (parolee plaintiff

---

[4] Defendants' exhibit demonstrating that Mr. Averhart's request for unsupervised visits is similarly unpersuasive.  (*See* Defs. Rep., Ex. A.)  Again, Plaintiff alleges that Defendants failed to follow the DOCCS Protocol prior to September 2, 2020.  Mr. Averhart was allegedly denied from attending J.C.'s birth and was again denied permission to live with her.  (Compl. ¶¶ 28–29, 40.)  The fact that Defendants denied Mr. Averhart's application to live with J.C. on July 31, 2021 does not remedy the fact that they allegedly failed to follow the DOCCS Protocol prior to September 2, 2020. (Defs. Rep., Ex. A.)

adequately pled procedural due process claim where parole officers violated DOCCS protocol by denying plaintiff access to his child without pre-or post-deprivation opportunities to be heard).

## IV.    Qualified Immunity

Finally, Defendants assert that Plaintiff's claims should be dismissed because they are entitled to qualified immunity.  (Defs. Mot. at 14–16.)  "Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Taylor v. Barkes*, 575 U.S. 822, 825 (2015) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)); *see also, e.g.*, *City & Cnty. of San Francisco, Calif. v. Sheehan*, 575 U.S. 600, 611 (2015); *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Lore v. City of Syracuse*, 670 F.3d 127, 162 (2d Cir.2012) (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001)).  Accordingly, for an action to lie, "existing precedent must have placed the statutory or constitutional question beyond debate." *Taylor*, 575 U.S. at 825 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)).  "This exacting standard 'gives government officials breathing room to make reasonable but mistaken judgments' by 'protect[ing] all but the plainly incompetent or those who knowingly violate the law.'" *Sheehan*, 575 U.S. at 611 (quoting *al-Kidd*, 563 U.S. at 743) (alteration in original).

Significant here, Defendants pursue qualified immunity on a motion to dismiss.  "[A] defendant presenting an immunity defense on a Rule 12(b)(6) motion instead of a motion for summary judgment must accept the more stringent standard applicable to this procedural route." *McKenna v. Wright,* 386 F.3d 432, 436 (2d Cir. 2004).  "[P]laintiff is entitled to all reasonable inferences from the facts alleged, not only those that support his claim, but also those

that defeat the immunity defense." *Id.* "[T]he motion may be granted only where 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief.'" *Id.* (quoting *Citibank, N.A. v. K–H Corp.,* 968 F.2d 1489, 1494 (2d Cir.1992)). Defendants therefore face a "formidable hurdle." *Id.* at 434.

As to the decisions made here for which Defendants seek immunity, at the time Defendants acted, "[i]t [wa]s well-established that a parent's interest in maintaining a relationship with his or her child is protected by the Due Process Clause of the Fourteenth Amendment." *Myers,* 426 F.3d at 125. Indeed, the Supreme Court has described "the interest of parents in the care, custody, and control of their children" as "the oldest of the fundamental liberty interests recognized by th[e] Court." *Troxel v. Granville,* 530 U.S. 57, 65 (2000) (plurality opinion); *see also, e.g., Quilloin v. Walcott,* 434 U.S. 246, 255 (1978) ("We have recognized on numerous occasions that the relationship between parent and child is constitutionally protected"); *Santosky v. Kramer,* 455 U.S. 745, 753 (1982) ("The fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents.").

The Second Circuit has applied these well-established principles to analogous parole and post-release supervision conditions. *See Myers,* 426 F.3d at 124 (condition of supervised release enforcing parental restrictions must "involve[] no greater deprivation of liberty than is reasonably necessary"); *McGeoch,* 546 F. App'x at 49 ("Absent an individualized inquiry into whether [supervisee's] sexual proclivities pose a threat to his sons," the "imposition of a harsh condition of supervised release that either prohibits interaction with his children or makes such interaction subject to supervision by a person approved of by the probation officer violates [his] due process rights"). While the factual backgrounds of these two cases slightly differ from the instant case, they are germane to the reasonableness of Defendants' actions here because denial of qualified

immunity "do[es] not require a case directly on point." *Taylor*, 575 U.S. at 825 (quoting *al-Kidd*, 563 U.S. at 741). It is sufficient that "existing precedent… have placed the statutory or constitutional question beyond debate." *Id.*

On the facts pled, the Court has already determined that Defendants allegedly violated Mr. Averhart's substantive due process rights under the Fourteenth Amendment by interfering with his familial liberty interests. The Court also finds that, in line with Second Circuit precedent, Mr. Averhart's liberty interest in his familial association with J.C. was clearly established at the time of Defendants' conduct. *See Myers*, 426 F.3d at 124; *McGeoch*, 546 F. App'x at 49. However, the Court must also determine whether Defendants' conduct was "objectively legally reasonable in light of the legal rules that were clearly established at the time it was taken." *Gonzalez v. City of Schenectady*, 728 F.3d 149, 154 (2d Cir. 2013) (citing *Taravella v. Town of Wolcott*, 599 F.3d 129, 133–134 (2d Cir. 2010)). Nevertheless, the Court finds that Defendants failed to act objectively reasonable. Despite Defendants' well-placed interest in wishing to protect J.C., a reasonable parole officer would not conclude that the deprivation of all contact between Mr. Averhart and J.C.— absent factual justification—was a reasonably and narrowly tailored restriction. *See Doe v. Annucci*, 2015 WL 4393012, at *13 (S.D.N.Y. July 15, 2015). Indeed, as described above, Defendants failed to conduct any individualized inquiry as to whether Mr. Averhart posed a threat to J.C. Defendants also failed to follow the DOCCS Protocol which would have guided them in making such a determination. (Compl. ¶¶ 54–57.)

Therefore, at this juncture, the Court finds that Defendants are not entitled to qualified immunity.

**CONCLUSION**

For the foregoing reasons, Defendants' motion to dismiss is GRANTED in part and DENIED in part. Due to Mr. Averhart's untimely death, all of Plaintiff's injunctive relief claims are denied with prejudice because they are now moot. All claims asserted against Defendants in their official capacity are dismissed with prejudice. All claims asserted against Defendant Annucci are therefore dismissed with prejudice and the Clerk of Court is respectfully directed to terminate him from this matter. All remaining claims asserted against Defendants Parker, Neely, and Osouna in their individual capacity are denied. Defendants Parker, Neely, and Osouna are directed to answer or otherwise respond to Plaintiff's Complaint by November 21, 2025. The Clerk of Court is respectfully requested to terminate the motion at ECF No. 61.

SO ORDERED.

Dated: October 29, 2025
      White Plains, NY

_____
Nelson S. Román, U.S.D.J.

26